```
 1              IN THE UNITED STATES DISTRICT COURT

 2           FOR THE SOUTHERN DISTRICT OF GEORGIA

 3                      BRUNSWICK DIVISION

 4    CAMDEN COUNTY d/b/a            )

 5    CAMDEN COUNTY BOARD OF         )

 6    COMMISSIONERS,                 )

 7                                   )

 8              Plaintiff,           )   CIVIL ACTION FILE

 9                                   )   NO. CV207-73

10    vs.                           )

11                                   )

12    ESTATE OF JOHNNY H. MURRAY     )

13    d/b/a INTEGRATED SYSTEMS       )

14    TECHNOLOGY, INC., and          )

15    BONAVENTURE GROUP, INC.,       )

16                                   )

17              Defendants.          )

18                      - - -

19    The deposition of DANIEL ARNOLD taken for all

20    purposes permitted by the Georgia Civil Practice Act; all

21    formalities waived, excluding the reading and signing of

22    the deposition; before Angela B. Williams, CCR; taken on

23    March 21, 2008, at 3379 Peachtree Road, Northeast, Suite

24    300, Atlanta, Georgia, commencing at 10:40 a.m.

25
```

```
 1                        APPEARANCES

 2      ON BEHALF OF THE PLAINTIFF:

 3      E. ALAN MILLER

 4      MARTENSON, HASBROUCK & SIMON, LLP

 5      3379 Peachtree Road, Northeast

 6      Suite 400

 7      Atlanta, Georgia  30326

 8      (404) 090-8100

 9      ON BEHALF OF THE DEFENDANT BONAVENTURE GROUP, INC. d/b/a

10      AFEX:

11      WILLIAM STANLEY ALLRED

12      BARRICKMAN, ALLRED & YOUNG, LLC

13      5775 Glenridge Drive, Northeast

14      Suite A-100

15      Atlanta, Georgia  30328

16      (404) 252-2230

17      ON BEHALF OF THE DEFENDANT ESTATE OF JOHNNY MURRAY d/b/a

18      INTEGRATED SYSTEMS TECHNOLOGY:

19      SARAH (SALLY) B. AKINS

20      ELLIS, PAINTER, RATTERREE & ADAMS, LLP

21      Tenth Floor

22      2 East Bryan Street

23      Savannah, Georgia  31401

24      (912) 233-9700

25
```

```
 1                          INDEX
 2     Page
 3      Cross-Examination:
 4     By Mr. Allred . . . . . . 5
 5     By Ms. Akins  . . . . . 124
 6      Direct Examination:
 7     By Mr. Miller . . . . . 129
 8                         EXHIBITS
 9      Defendant                          Page Marked/
10      Exhibit No.      Description          Identified
11     1  Daniel Arnold's Report        21/21
12     2  Daniel Arnold's Folder        21/21
13     3  Gussett/Redwell containing    29/27
14              Correspondence, Emails,
15              Engle Martin Reports,
16              AFEX 2000 Installation, Operation,
17              Maintenance and Service Manual
18     4  Notebook containing AFEX Installation, 30/26
19              Operation, Maintenance and Service
20              Manual, AFEX Technical Reference
21              Manual and NFPA 17 2002 Edition
22     5  Disk of Photos                31/30
23      (All exhibits above retained by Daniel Arnold.  Copies not
24      attached hereto.)
25      Defendant Tijerina
26      Exhibit No.
27     1  Black and white copy of photograph    */47
28     2  Black and white copy of photograph    */47
29      *(Tijerina Exhibits not attached hereto.)
30                          Attachments
31
32      Copies of photographs
33
```

PDF
Complete

Click Here & Upgrade
Expanded Features
Unlimited Pages

```
 1                      P R O C E E D I N G S

 2                              10:40 a.m.

 3      (Whereupon, the court reporter complied with the

 4      requirements of O.C.G.A. 9-11-28(d).)

 5      MR. ALLRED:  This will be the deposition of Dan

 6       Arnold being taken for purposes of discovery, cross-

 7       examination and any other purpose permitted by the

 8       Federal Rules of Civil Procedure.  It's being taken by

 9       the Defendants.  It's being taken by agreement of

10       counsel though we have subpoenaed the witnesses.  The

11       deponent has indicated he would want to read and sign

12       his deposition which is obviously fine and it's

13       certainly fine with us that you do that before any

14       notary as well.  And if it's agreeable we will reserve

15       all -- all objections except those going to the form

16       of the question or responsiveness of the answer until

17       first use of the deposition.  Is that okay?

18      MS. AKINS:  Yeah.

19      MR. ALLRED:  I sound like blah, blah,

20       blah -- Daffy Duck this morning.  Sorry about that.

21       All right.  Could you please --  She's going to swear

22       you in first.

23      (Witness sworn.)

24       \

25       \\par
```

```
 1      Whereupon,

 2                      DANIEL ARNOLD

 3      was called as a witness herein and, having been first

 4      duly sworn, was examined and deposed as follows:

 5                      CROSS-EXAMINATION

 6      BY MR. ALLRED:

 7      Q. All right.  Did you bring your report with you

 8       today?

 9      A. I did.

10      Q. Did you bring your photographs with you today?

11      A. I did.

12      Q. That's good.  Because I've never seen your

13       photographs before so I get to look at them today.

14      Could you identify yourself for the record,

15       please?

16      A. My name is Daniel Arnold.

17      Q. Okay.  Do you go by Daniel?

18      A. Dan is fine.

19      Q. Dan is fine, okay.  And what --  Give us an idea

20       of your educational background.  Where did -- where did you

21       go to school?

22      A. I'm a fire protection engineer.  I have a degree

23       in fire protection engineering from the University of

24       Maryland.

25      Q. Okay.  Did you grow up in Maryland?

26
```

Click Here & Upgrade
Expanded Features
Unlimited Pages
PDF
Complete

1    A. High school beyond, yes.

2    Q. Okay.  And did you go to school beyond college?

3    A. No.

4    Q. Did you get a degree from Maryland?

5    A. I did.

6    Q. And that was College Park?

7    A. It is.

8    Q. Okay.  Are you certified in Georgia or nationally

9     as a fire investigator or an explosion expert or a cause

10    and origins expert of any fashion?

11   A. No.  I'm registered in the state of Georgia as a

12    fire protection engineer.

13   Q. Okay.  All right.  And how often does --  Do they

14    have continuing ed requirements?

15   A. They did.

16   Q. Okay.  What does that run usually?

17   A. It varies by state but it's -- can range from 15

18    to 30 hours bi -- biannually or annually.  It depends on

19    the state.  I'm registered in several states so it varies.

20   Q. What did you do to further your training in fire

21    protection or inspection after you left college?

22   A. I participated in industry conferences and

23    technical seminars including those put on by the Society of

24    Fire Protection Engineers and the National Fire Protection

25    Association both provide that training and attended that

26

Click Here & Upgrade
Expanded Features
Unlimited Pages

PDF
Complete

1    training over the course of my career.

2    Q. Now the report that you authored says it's from

3    Seneca Fire Engineering.  Is that your company?

4    A. It is.

5    Q. Okay.  How long have you operated Seneca?

6    A. Since 2001.

7    Q. Okay.  Where were you before that?

8    A. I was with a fire protection engineering firm,

9    Rolf Jensen & Associates.

10   Q. All right.  And where were they out of?

11   A. They're national but actually they have an

12   Atlanta office and I was -- I ran their Atlanta office.

13   Q. Okay.  For how long did you do that?

14   A. I was with Rolf Jensen 15 to 18 years.

15   Q. Okay.  In your capacity as a -- as a fire

16   protection engineer --  Is that what you call it fire

17   protection engineer?

18   A. That's correct.

19   Q. Okay.  What -- give me an idea --  Break down for

20   me what you do with your time?  I mean is it --  Do you go

21   inspecting before a loss, sort of loss prevention type

22   issues?  Do you go out only after losses as a forensics

23   expert to identify cause of loss and be in a position to

24   offer your opinions about that?  I mean what percentage of

25   your time is dedicated to what?

26

Click Here & Upgrade
Expanded Features
Unlimited Pages

PDF
Complete

```
1    A. Well it's changed over the course of my career.

2      I've been involved and continue to do all aspects of fire

3      protection engineering including design, consulting with

4      owners, architects, other engineers and also do loss

5      investigation, some of which at some point in time may

6      involve litigation or providing opinions with regard to

7      those investigations.  I don't keep track as to percentages

8      of one versus the other but later in my career and

9      currently the -- more of what I do is loss investigation

10     versus design which I did earlier in my career.

11   Q. Okay.  Do you --  As an expert do you -- do you

12     maintain a file that keeps up with your -- where you

13     testify, where you go to court for purposes of the

14     federal rules?

15   A. I was instructed a number of years ago to keep a

16     list and that list I think is attached to my report.

17   Q. Okay.  All right.  And then I have --  This is

18     what was provided to me by Mr. Miller.  It is a Summary

19     Report and then attached to that is an Appendix A, which is

20     your CV, and an Appendix B, which is your list of

21     testimony.  Why don't you look through that real fast and

22     tell me is that what you've supplied so far by way of a

23     report, a CV, and a list of testimony?

24   A. (Witness complies with request of counsel.)  Yes,

25     it is.  Appears to be.

26
```

Click Here & Upgrade
Expanded Features
Unlimited Pages
PDF
Complete

```
1   Q. And -- and are the -- is the list complete?  Has

2    there been anything recently since you authored it?

3   A. I have provided one additional deposition that's

4    not currently on this -- this list.

5   Q. Did it have anything to do with a fire

6    suppression system on heavy equipment?

7   A. It did not.

8   Q. Okay.  Prior to today, has any of your work

9    involved investigation of a fire on a piece of heavy

10   equipment where that piece of equipment's fire suppression

11   system did not work as designed?

12   A. I've been involved in an investigation of fire

13   equipment -- excuse me -- of a heavy equipment fire

14   involving fire suppression system where there were

15   allegations that that was the case and I participated in

16   the investigation.

17   Q. Okay.  One or several?

18   A. Just one that I recall.

19   Q. What -- and what -- what kind of piece of

20   machinery was that?

21   A. It was a large Komatsu dump -- dump truck, very

22   large dump truck.

23   Q. Okay.  Where was that?

24   A. It was in a mining operation in West Virginia.

25   Q. And did you give testimony in that case?

26
```

1    A. No.

2    Q. All right.  Do you recall the -- who the

3     manufacturer of the fire suppression system was?

4    A. Yes.

5    Q. Who was that?

6    A. Ansell.

7    Q. And I think based on what you said it was alleged

8     that the fire suppression system did not work properly?

9    A. The fire suppression system is one aspect of the

10    investigation that was considered because it was -- had a

11    fire suppression system.  And given the damage to the

12    equipment it -- it was inquired as to why that occurred

13    given the fact that the suppression system was there so the

14    investigation looked into those aspects.

15   Q. Do you know was there litigation that developed

16    out of that?

17   A. It's a recent -- recent case.  There -- there may

18    be litigation but I'm not intimately aware of that.

19   Q. And who -- who have you --  Who are you

20    representing, which player in that dispute?

21   A. I don't know if there is a dispute yet because I

22    don't know that there's any litigation but I was retained

23    by I believe it was the insurance carrier for the mining

24    company --

25   Q. Okay.

26

1    A. -- who operated and owned the machine.

2    Q. Okay.  Has there been an inspection of the

3     machinery since the fire?

4    A. Several.

5    Q. Okay.  And has Ansell had an -- an engineer out

6     there as well?

7    A. Yes.

8    Q. Okay.  All right.  And have you developed any

9     opinions in that case that the fire suppression system did

10    not discharge?

11    A. No.

12    Q. Okay.  Does that -- did that fire suppression

13    system on the dump truck work similarly to the AFEX system

14    on this compactor?

15    A. Yes, similarly.

16    Q. Okay.  All right.  And is that the

17    only -- are -- Is this case and that case in West

18    Virginia, are those the only cases that you've been

19    involved with in your career concerning a fire suppression

20    system on heavy equipment?

21    A. That I recall, yes.

22    Q. Okay.  What sort of training, educational

23    background do you have in terms of how a fire suppression

24    system on a piece of heavy equipment works?

25    A. Well fire suppression systems generally work

26

1      similarly whether they're on fire protection -- well

2      whether they're on heavy equipment in a building or some

3      particular application so the functioning of the system are

4      not dramatically different from system type to system type

5      or hazard type to hazard type.  My training and education

6      includes fire suppression systems generally and

7      specifically their application to particular hazards.

8      Q. Okay.  Does it include application to heavy

9      equipment?

10     A. Yes.  There was part of my training and school

11     included the application of fire suppression systems to

12     industrial equipment including heavy mobile equipment.

13     Q. Okay.

14     A. And they are standards on that.  It's

15     the --  What's unique is the hazard, not necessarily so

16     much the system.

17     Q. All right.  Well I guess, for example, were you

18     ever schooled in terms of -- you know, if, for example,

19     we're talking about a manual activation of a system, from

20     the moment that plunger goes down to the point dust or dry

21     chemical comes out of the nozzles what's going on in that

22     system?  You can tell me that insofar as how that worked on

23     this fire suppression system, right?

24     A. Yes.

25     Q. Okay.  Let's see now.  Okay.  And could I --  Do

26

Click Here & Upgrade
Expand Your Features
Unlimited Pages
PDF
Complete

1      you have another copy of your report?

2    A. I do.

3    Q. Great.  And if you could pull it out that would

4      make it easier.  That way I can -- we can be on the

5      same page.

6    MR. MILLER:  I'll be right back.

7    MR. ALLRED:  Okay.

8    (Whereupon, a brief recess was taken.)

9      BY MR. ALLRED:  (Resuming)

10   Q. When was your first inspection of this machine by

11     the way?

12   A. In November of 2005.

13   Q. And who accompanied you or who else was there

14     with you?

15   A. Mr. Tony Tijerina.

16   Q. Okay.  Anybody else?

17   A. I believe we were accompanied by Mr. Chris

18     Martin.

19   Q. Okay.  How about Mr. Hershberger?

20   A. No, I did not meet with Mr. Hershberger

21      on -- on -- on that visit.  He was not working.

22   Q. Have you ever met with him?

23   A. I have.

24   Q. And when was that?

25   A. On March 3rd, 2006.

26



1   Q. Okay.  Is that in your report?

2   A. I can look and see.

3   Q. Oh okay.  Well no, no, no.  You're --  That's

4    fine.  You're just looking at something besides your

5    report?

6   A. Yes, sir.

7   Q. Let's identify those first and then we'll get all

8    that marked up then.  What -- what are you looking at

9    there,  some notes you have from your visits?

10  A. Yes.  I'm looking at, in answer to your last

11   question, my interview notes from an interview I -- I

12   participated in with Mr. Hershberger on March 3rd, 2006.

13  Q. Okay.  And then what's next in your file there?

14  A. A list of --  The document provided to Mr. -- Mr.

15   Miller in terms of suggested areas and questions of inquiry

16   for information that I -- I thought would be useful in

17   obtaining from AFEX.

18  Q. Okay.  And this is communication to you about

19   what type of inform -- or is this to AFEX?

20  A. From me to Mr. Miller.

21  Q. Okay.  About what he should get from AFEX?

22  A. Correct.

23  Q. All right.  Did that include the firing

24   mechanism?

25  A. Information concerning the firing mechanism,

26

PDF
Complete

Click Here & Upgrade
Expanded Features
Unlimited Pages

1      yes, sir.

2      Q. I mean did you ask him to get you a fire --

3      A. Yes, sir.

4      Q. -- an example of a firing mechanism?

5      A. Yes, sir.

6      Q. Okay.  Have you looked at the exemplar yet?

7      A. I did.

8      Q. Okay.  I'm going to move around a little bit.

9       Why don't you put that to the side.  And what's next in

10      your file?  There's some yellow paper there.

11     A. These are handwritten notes of my interview with

12      Mr. Hershberger from which the typed notes were summarized.

13     Q. All right.  So you took those March '06?

14     A. Correct.

15     Q. Okay.  And then what's next?

16     A. A copy of an invoice that was provided to me

17      if I recall correctly by Mr. Chris Martin regarding

18      the -- the -- a repair that had been done to the compactor

19      in -- in April 2005.

20     Q. Okay.  And then what's the next thing?

21     A. A photocopy of a sheet from the compactor

22      system's operation manual I believe that was provided to me

23      by Mr. Martin.

24     Q. And what page?

25     A. Page 23.

26

```
1    Q. Okay.  And when did he provide that to you?

2    A. The same time he provided me this invoice.

3    Q. Do you remember when that was?

4    A. I think it was in November but I didn't

5     date them.

6    Q. Okay.

7    A. It's my best recollection.

8    Q. Is it your understanding then that in November

9     of -- by November of 2005 Mr. Martin had an operations and

10     installation manual for the fire suppression system?

11    A. No, sir.

12    Q. Just for the machine?

13    A. That's from which this copy was made of.

14    Q. Okay.

15    A. I -- I asked Mr. Martin if he had any such

16     information and he told me he did not.

17    Q. Okay.  So that's just from the Caterpillar

18     manual?

19    A. Correct.

20    Q. And what -- what is the focus of that particular

21     page?

22    A. The alert indications associated with the

23     Caterpillar panel.

24    Q. Okay.  Warning lights?

25    A. Correct.

26
```

Click Here & Upgrade
Expanded Features
Unlimited Pages
PDF
Complete
Documents

```
 1    Q. All right.  And then what is next in your stack

 2     there?

 3    A. Some cryptic notes I made when I was reviewing

 4     Mr. Smith's deposition.

 5    Q. All right.  And what is next?

 6    A. Some notes I made on October 28th, 2005 of a

 7     conversation I had with Mr. Miller.

 8    Q. Okay.  And next?

 9    A. Just a --  Well it's a working timeline if you

10     will of events and dates that I kept as I became familiar

11     with this case over the what happened when.  Just a

12     sequence of events if you will, general sequence of events.

13    Q. And let me --  I'm sorry.  Let me bounce back

14     with you to the October 28th notes you have.  What was the

15     gist of the conversation on October 28th?

16    A. I believe it was about my retention in this

17     matter and directed me to contact a Mr. Newman Stanley to

18     coordinate a site visit and provide me some names and

19     numbers.

20    Q. And did you call Mr. Stanley?

21    A. I don't have any --  I -- I may have to

22     coordinate that visit or Mr. Tijerina may have.

23    Q. Because I noticed on another set of your notes in

24     yellow there's a business card stapled to the top corner

25     and it looked like Mr. Stanley's business card; is

26
```

1      that right?

2      A. Yes.

3      Q. Does that mean you didn't get that card until

4      March?  Are those cards of the people who were at the March

5      inspection, in other words?

6      A. I believe that's probably true, yes.

7      Q. Okay.  So there's like Sally Akins, right?

8      A. There's Mr. Larry Helton, Mr. -- Ms. Sally

9      Akins, --

10     Q. Uh-huh (affirmative).

11     A. -- Mr. Randy Smith and Mr. Newman Stanley.

12     Q. All right.  Now all those people were at the

13     March inspection?

14     A. Yes.

15     Q. Okay.  But none of them except Mr. Tijerina were

16     with you at the November inspection?

17     A. That's my recollection, correct.

18     Q. Was Mister --  Do you know if I said to you

19     Lannie Brant or Lannie (different pronunciation) Brant,

20     would you know who I was referring to?

21     A. I don't -- in the --  I want to be complete.

22     There was a -- a piece of yellow paper stuck in here also,

23     some notes from a deposition I read concerning Mr. Austin

24     Latham.

25     Q. Okay.

26

```
 1    A. I'm sorry.  Your question?

 2    Q. Do you remember having any conversations with a

 3     gentleman named Lannie Brant, the director of the solid

 4     waste division of Camden County?

 5    A. I met with Mr. Brant I believe in order to get

 6     access to the machine.  I believe his -- he is a site -- he

 7     was a site contact name given to me in my conversation with

 8     Mr. Miller in October.

 9    Q. Okay.  So then in November you go and -- to meet

10     him?  Did you sit down and talk with him?

11    A. Briefly for introductory purposes I believe so.

12    Q. Okay.  Nothing substantive about what had

13     happened or what caused the fire or anything about the fire

14     suppression system in particular?

15    A. I think he provided me some -- some information

16     as to the -- the -- their expectations that the suppression

17     system didn't function, didn't discharge when the operator

18     attempted to do so.

19    Q. Okay.  Did he have any discussion with you at all

20     about any other individuals who had been out before

21     November 11 to look at the machine?  Did he identify

22     anybody?

23    A. I don't recall specifically if he did.  He may

24     have.

25    Q. Now you've got some handwritten notes following

26
```


Click Here & Upgrade
Expanded Features
Unlimited Pages
PDF
Complete
Documents

```
 1      your reading of Mr. Latham's deposition and Mr. Smith's

 2      deposition.  Do you have any handwritten notes --  Well

 3       strike that.

 4     Did you read Mr. Hershberger's deposition?

 5     A. I did.

 6     Q. Did you read Mr. Martin's deposition?

 7     A. I did.

 8     Q. Did you read Mr. Brant's deposition?

 9     A. I did.

10     Q. Do you --  Did you take notes for those?

11     A. I didn't take notes.  I would have high --  I

12      highlighted and --

13     Q. Oh okay.

14     A. -- annotated on -- on the deposition transcripts

15      and I brought those with me today.

16     Q. All right.  So -- so if we look through your

17      transcripts we'll see some highlighter and some notes that

18      you took?

19     A. Maybe some notes.  Certainly some -- some

20      highlights of sections of the depositions for all the

21      depositions that I've read.

22     Q. Okay.

23     MR. ALLRED:  All right.  I'm just trying to

24      figure out how we're going to do this.  Well I guess

25      what I'd like to do is if we can mark his whole folder

26
```

```
1      as Exhibit --  Let's see; have we marked anything yet

2      to your deposition?  Let's -- let's mark his report as

3      Number 1 and we'll let you keep it because we have

4      copies.  You can just put that on the bottom corner

5      anywhere.

6      (Whereupon, the court reporter

7      marked Defendants' Exhibit

8      No. 1 for identification.)

9      MR. ALLRED:  And then we'll mark your folder as

10      you -- as you've just described its contents as Number

11      2.

12      (Whereupon, the court reporter

13      marked Defendants' Exhibit

14      No. 2 for identification.)

15      MR. ALLRED:  What I'd like to do is get color

16      copies of those pages of your -- the depositions that

17      you've read that are highlighted, okay, so we can see

18      what's highlighted.  All right.

19      BY MR. ALLRED:  (Resuming)

20      Q. And you --  And -- and I understand you've got a

21      deposition -- you've got deposition transcripts from

22      Hershberger, Brant, Martin, Smith, and Latham?

23      A. Hershberger, Martin --  That's correct.

24      Q. Okay.  Great.

25      MR. ALLRED:  I don't see any point unless anybody

26
```


Click Here & Upgrade
Expanded Features
Unlimited Pages
PDF
Complete

1     else wants me to mark them as exhibits as long as we

2     can get an agreement from you and get color copies of

3     the pages where he's either highlighted or made

4     notes on.

5     MR. MILLER:  That's fine.

6     MR. ALLRED:  Okay.

7     MR. MILLER:  It might be the entire deposition.

8     MR. ALLRED:  That's fine.

9     THE WITNESS:  I'll be --

10    MR. ALLRED:  I have to pay.  Whatever it takes.

11    MR. MILLER:  Okay.

12    MR. ALLRED:  And if it's easier just to get color

13    copies of the whole thing, that's fine.  Instead of

14    the manual labor of picking pages out if it's just

15    easier to run them through a color copier that's fine

16    or send it out as far as that goes.  All right.  You

17    probably want to leave those with -- with Alan.

18    BY MR. ALLRED:  (Resuming)

19    Q. Okay.  Let's see; prior to November 11, 2005, who

20    besides Alan Miller did you speak to about this project?

21    A. If anyone it would have been Mr. Tijerina.

22    Q. All right.  Okay.  And then at the dump, landfill

23    you had an introductory session with Mr. Brant and then I

24    think you said Mr. Martin took you to the machine?

25    A. That's correct.

26

Click Here & Upgrade
Expanded Features
Unlimited Pages
PDF
Complete

1    Q. Now was the machine still up on the hill or had

2     they brought it back down to the shop or near the shop

3     by then?

4    A. It was not up on the hill.  It was down off of

5     the hill as they called it.

6    Q. Was it still outside?

7    A. It was.

8    Q. Okay.  Was it protected or covered?

9    A. I recall it may have been partially tarped but

10     maybe not.  I would have to refer to photographs to -- to

11     see that.

12    Q. Okay.  Do you know what efforts were

13     take -- undertaken by Camden County to, I don't know, for

14     lack of a better term weather in the compactor to put it in

15     a dry space where the elements wouldn't get to it?

16    A. No.

17    Q. Okay.  Do you know in fact that it is -- for the

18     most of the time was left out on the hill in the rain or

19     the sun or whatever?

20    A. I just know where it was when I -- when I saw it.

21    Q. Okay.  Did you take a camera with you?

22    A. I did.

23    Q. Okay.  How many pictures, you know, roughly, did

24     you take that day of the 11th -- on the 11th of the

25     machine?

26


Click Here & Upgrade
Expanded Features
Unlimited Pages
PDF
Complete
Documents

```
 1      A. Probably 80.

 2      Q. Okay.  And you have those here with you today?

 3      A. I do.

 4      Q. All right.  Could you pull those out for us,

 5       please?  Definitely want copies of those.  In fact, is

 6       there a way you can get digitals?  Do you have them

 7       digital?  Can we get a copy of the disk?  That's probably

 8       the easiest way to do it.

 9      MR. MILLER:  Sure.

10       BY MR. ALLRED:  (Resuming)

11      Q. Do you have hardcopy color copies of those?

12      A. I have hardcopy prints with me today.

13      Q. Okay.  Good enough.

14      MR. ALLRED:  And I'm sorry to do this.  But do

15       you guys mind if we take about a five-minute break?

16      MR. MILLER:  Not at all.

17      (Whereupon, a brief recess was taken.)

18       BY MR. ALLRED:  (Resuming)

19      Q. What I'm trying to do first is figure out what

20       you've looked at and what you have.  You have obviously

21       another gusset down there on the floor.  So I need to

22       identify all the goodies that you've got and that you've

23       looked at as -- to form your opinions.  So in addition to

24       what we've already been through, for instance, did -- did

25       you ever get a copy of the installation manual for the

26
```

PDF
Complete

Click Here & Upgrade
Expanded Features
Unlimited Pages

1      AFEX system?

2   A. Yes.

3   Q. All right.  Do you have that with you?

4   A. Yes.

5   Q. Do you have everything with you that you relied

6    on to formulate your opinions?

7   MR. MILLER:  Well I'm going to object to the form

8    of the question.  He has his file with him I believe

9    but I think that -- I don't know that all of that was

10   used to formulate his opinion so...

11  MR. ALLRED:  Well he can tell me that.

12  MS. AKINS:  He can answer the question.

13  MR. ALLRED:  He can tell me that.

14   BY MR. ALLRED:  (Resuming)

15  Q. I mean, in other words, you might have a textbook

16   up on the wall, you know, by professor whatever from

17   University of Maryland on fire inspection that you -- on

18   page 676 but I'm not talking about general text.  I'm

19   talking about case specific documents.  Did you bring them

20   all here?

21  A. Yes.

22  Q. All right.  And so -- so, for example, there's

23   not -- there's not an electronically stored document that

24   you were sent, looked at, and it's not here?

25  A. Correct.

26



Click Here & Upgrade
Expanded Features
Unlimited Pages

```
1    Q. Okay.  Why don't --  You have one gusset

2     with you?

3    A. One gusset and a notebook.

4    Q. And a notebook.  What's in the notebook?

5    (Whereupon, a discussion ensued of the record.)

6     BY THE WITNESS:  (Resuming)

7    A. Did you finish with these photographs or --

8    Q. Not yet.  But we're going --  For -- for purposes

9     of knowing that you have them at this point, yes, and then

10    we'll start going through them.

11   A. In the notebook is the AFEX Installation

12    Operation Maintenance and Service Manual that was provided

13    to me, the AFEX Technical Reference Manual, --

14   Q. Okay.

15   A. -- and NFPA 17, 19 -- 2002 Edition.

16   Q. Okay.  And did you rely on at least portions of

17    all three of those to formulate any of your opinions in

18    this case?

19   A. Yes.

20   Q. Okay.  And I -- I take it I see a lot of pink --

21    pink Post-it notes in there.  Those are points of reference

22    or of importance for you?

23   A. (No response.)

24   Q. Or things that as you were reading through you

25    thought, well, these could be important so I'll mark them?

26
```

1    A. More so for ease of finding them as opposed to

2     any sort of category of importance.

3    Q. Okay.  And we'll get into that as we go on.

4     What else is in your -- your gusset or redwell or

5     whatever -- whatever you call it?

6    A. A file that I've labeled correspondence and

7     e-mail.

8    Q. Okay.

9    A. A file that I have entitled Engle Martin reports.

10    A file that is labeled AFEX 2000 Installation, Operation,

11    Maintenance and Service Manual which is a duplicate manual

12    of the manuals contained in the notebook.

13   Q. Okay.  And that one has blue Post-its so is that

14    to say that you went through it twice?

15   A. No.  It just means that when I went through it I

16    put Post-its on it.

17   Q. Okay.  But didn't you do the same to the copy in

18    the notebook?

19   A. I did.

20   Q. Okay.  Did you go through page by page and

21    compare one to the other and make sure there were Post-its

22    on both page -- on the same pages?

23   A. No.  But I -- I --  Doesn't mean I only went

24    through it twice.

25   Q. Oh no.  It might be more than that.

26

```
1    A. I'm sorry.  I was answering your question

2     literally.

3    Q. Okay.  All right.  The correspondence folder, let

4     me see; you've got a correspondence folder, you've got

5     a -- what was the other one -- oh Engel Martin report.  Who

6     did that one?

7    A. (No response.)

8    Q. And who are Engle Martin?

9    A. Engle Martin is a -- I guess they're an adjusting

10     company.

11   Q. All right.  Did they hire you?

12   A. No, sir.

13   Q. Mr. Miller hired you?

14   A. Yes, sir.

15   Q. All right.  So these were adjuster reports that

16     were generated during their investigation of the case?

17   A. Presumably and provided to me.

18   Q. All right.  Was -- was Mr. Steber, Joel Steber,

19     the guy who offered those?

20   A. Yes.

21   Q. Okay.  All right.  And those were provided to you

22     by Mr. Miller or by Mr. Steber?

23   A. Mr. Miller.

24   Q. Okay.  Were those of any importance to you?

25   A. For background information and their -- the

26
```

```
 1     photographs attached and some documents are attached were

 2     information that was a part of the things I reviewed in

 3     doing my -- my investigation.

 4   Q. Okay.  Why don't you tuck that back in the

 5     redwell and then we'll just mark the redwell as exhibit

 6     number -- are we up to 3?

 7   MR. MILLER:  There may be contained in that

 8     redwell some attorney work product information and

 9     we'll need to go through it in order to --

10   MR. ALLRED:  Okay.  I don't know if that exists

11     once you identify him as an expert.

12   MS. AKINS:  Once you --  I think once you give it

13     to him that's gone.

14   MR. MILLER:  Well...

15   MR. ALLRED:  I mean that's something we fight

16     about --  I appreciate what you're saying, I really do

17     because I've been in that fight too.  But --

18   MR. MILLER:  I'm going to make the objection.

19   MR. ALLRED:  Sure.  For -- for the record it

20     would be our contention that any -- go ahead and mark

21     the redwell -- that -- that any correspondence that

22     you've shared with Mr. Arnold is subject to discovery.

23   (Whereupon, the court reporter

24   marked Defendants' Exhibit

25   No. 3 for identification.)

26
```

```
1      BY MR. ALLRED:  (Resuming)

2     Q. Okay.  And then why don't you --

3     MR. MILLER:  The correspondence I shared with him

4      as far as Engel Martin, yes, but correspondence from

5      me to him I'm saying no.

6     MR. ALLRED:  Yeah.  And we're saying yes.

7     MS. AKINS:  And we're saying yes to that.

8     MR. ALLRED:  Okay.  And this a sticker for Number

9      4.  If you'd put that on your notebook

10    (Whereupon, the court reporter

11    marked Defendants' Exhibit

12    No. 4 for identification.)

13     BY MR. ALLRED:  (Resuming)

14    Q. All right.  And then --  Now you've got two

15     Wal-Mart envelopes of photographs there and one disk.

16     Is --  Are all the photographers that are in the Wal-Mart

17     packages on the one disk?

18    A. Yes.

19    Q. Could you please put that sticker number five

20     on -- Defendants' Exhibit 5 on the disk?

21    A. On the case I presume?

22    Q. Yeah.  That's fine.  It might start spinning kind

23     of catawampus.

24     \

25     \

26
```



```
1    (Whereupon, the court reporter

2    marked Defendants' Exhibit

3    No. 5 for identification.)

4     BY MR. ALLRED:  (Resuming)

5    Q. All right.  Had you ever heard of AFEX before

6     November 11 -- or before September 28, 2005?

7    A. I may have.  I don't recall.

8    Q. Okay.  Had you ever inspected one of their fire

9     suppression systems before?

10   A. I'm not sure.

11   Q. Okay.  I think you said on November 11th you

12    spoke with Chris Martin.  Did you make any notes of your

13    conversation that you had with Mr. Martin?

14   A. No.

15   Q. All right.  Do you have a memory of anything he

16    told you about either the condition of the machine or what

17    he had seen others do to the machine since the fire?

18   A. No.

19   Q. Did you see --  Did you read his deposition?

20   A. I did.

21   Q. Did you see where he saw some people cut -- he

22    says cut wires or hoses with a knife?

23   A. Yes.

24   Q. Did you see evidence of that in any of your

25    inspections of the machine?

26
```

Click Here & Upgrade
Expanded Features
Unlimited Pages
PDF
Complete

1    A. Once I reviewed his deposition I went back and

2      looked at my photographs based on areas that he described

3      and I saw what appeared to be photographic indications of

4      that work.

5    Q. Okay.  And are you in a position today to

6      identify that in your photographs?

7    A. I could try, sure.

8    Q. Well -- well did you make notes of it --

9    A. No.

10   Q. -- when you did it?

11   A. No.

12   Q. Okay.  So you read his deposition, had an

13     interest to go back and see the pictures and found what you

14     thought could be evidence to support that but you didn't

15     make notes of where -- of which photos those were?

16   A. That's correct.  As I was reading deposition I

17     would go back to the photographs and -- and look.

18   Q. And so I guess would it be fair to say

19     you're -- you're fairly certain you could find the

20     photographs right away?  You know what you're looking for

21     in that regard?

22   A. Reasonably confident I could do that.

23   Q. Okay.  Why don't you take the time to do that?

24   A. (Witness complies with request of counsel.)

25     These are two examples of the photographs --

26



1    Q. Okay.

2    A. -- that I was referring to.

3    Q. Hold on.  Set those aside if you would.  And then

4     just go through all your photographs.  Let's get them all

5     out here, all the ones that you think support the notion

6     that a wire or hose was cut or broken.

7    A. (Witness complies with request of counsel.)

8    (Whereupon, a discussion ensued off the record.)

9     BY THE WITNESS:   (Resuming)

10    A. I pulled out ten photographs that are the types

11     of photographs that I would have referred to when I read

12     Mr. Martin's deposition identifying the areas that he

13     observed in his testimony that destruction was done to the

14     system during his -- during I guess it was the October

15     inspection by others.

16    Q. Okay.  And you didn't see any others in

17     those -- in either of those two stacks?

18    A. I pulled the ones that I quickly identified.  I

19     didn't study them in great detail but I pulled the ones

20     quickly that I think were the ones I would have gone back

21     and looked at as I doing his deposition in response to your

22     earlier question.

23    Q. Sure.  All right.  And those pictures by the way,

24     the -- the two envelopes of pictures that are on the disk

25     as Defendants' Exhibit 5, were all of those taken on

26

Click Here & Upgrade
Expanded Features
Unlimited Pages
PDF
Complete
Documents

1    November 11, 2005?

2    A. I believe so, yes.

3    Q. Did you take any pictures on -- in March 3, 2006?

4    A. I don't think so.  I think on March 3rd it was

5     principally in -- I participated in the interview of

6     Mr. Hershberger.

7    Q. Did you not participate in an inspection of the

8     machine on March 3, 2006?

9    A. I did.

10   Q. Okay.  Incidentally were -- were any of the dry

11    chemical canisters open on March 3, 2006?

12   A. I'm sure there were.

13   Q. Okay.  Do -- do you remember looking in them?

14   A. I -- I do.

15   Q. Okay.  Was there dry chemical in them?

16   A. There appeared to be, yes.

17   Q. Were they almost full?

18   A. It -- it was caked.  I don't know what almost

19    full means.  We didn't weigh them.  But there was certainly

20    substantive dry chemical remaining in the canisters.

21   Q. Well did it -- did it look like a -- a discharge

22    had taken place when you looked at how much content was

23    still in the canisters?

24   A. Not a complete discharge likely.

25   Q. Okay.  And -- and something that could have been

26

1    just as consistent with a heat caused rupture of the seal

2    on those canisters, right?

3    A. Yes.

4    Q. Okay.  And when I say heat I don't mean induced

5    by a sensor setting off the discharge of the system.  I

6    mean heat building up pressure within the canister and

7    making the seal break.  Is that what you understood me to

8    mean?

9    A. No.  I understood -- understood something

10    different because there is no pressure in the canister but

11    I -- I believe we were communicating.

12    Q. All right.

13    A. Heat induced on the -- on nitrogen cartridges

14    associated with the canisters.

15    Q. Okay.  All right.  And that would be the

16    ten-ounce nitro bottles next to the canisters, not the

17    one-ounce up in the cab, right?

18    A. Correct.

19    Q. Okay.  All right.  Did you meet a fellow

20    named Orville Sanders during any of your inspections?

21    He -- he -- Just -- just so you know he -- he is not

22    somebody who's been deposed so...

23    A. That name is not coming to mind if I -- if

24    he --  I don't have his business card.  I don't have any

25    notes of that.

26

1    Q. Okay.  And then besides --  Did you understand

2     that Jim Hershberger was the operator at the time of

3     the fire?

4    A. At the time of the August fire, yes, sir.

5    Q. Yeah.  And that --  And that's why you

6     interviewed him, right?

7    A. Correct.

8    Q. Okay.  Well he was the --  Was he the operator at

9     the time of the April fire as well -- or I'm sorry -- March

10    fire, March 2005?

11   A. Yes.  He was the operator from the prior -- the

12    prior event, yes.

13   Q. Okay.  Was he the operator for the April

14    discharge of the system, the fire suppression system where

15    there was not a fire?

16   A. Yes.

17   Q. Okay.  So you believe that Mr. Hershberger as far

18    as what you've been told or provided was the operator on

19    all three of those discharges -- or I'm sorry -- all three

20    of those incidents?

21   A. No.  We may not have been communicating.  I

22    believe Mr. Hershberger was the operator of the April 2005

23    event --

24   Q. Uh-huh (affirmative).

25   A. -- and then the August 2005 fire.

26

Click Here & Upgrade
Expanded Features
Unlimited Pages
PDF
Complete

```
 1   Q. Okay.  Was the -- was the April 2005 event the

 2    time when the system discharged without a fire or was there

 3    a fire in April?

 4   A. The August --  The April 2000 event was the time

 5    it was discharged manually by Mr. Hershberger.

 6   Q. Because of a fire?

 7   A. Because of his observations of what he called a

 8    heat plume.

 9   Q. Okay.  All right.  So he --

10   A. He didn't observe any flames during that event.

11    So that's -- that's probably why we weren't communicating.

12    So I wouldn't call that --  He didn't call it a fire.  He

13    called it an event.  He manually discharged the suppression

14    system.

15   Q. And -- and would a heat plume be -- ignite a gas

16    or ignited hydraulic fluid?  What's -- what's a heat plume?

17   A. As he described it, heat plume is basically

18    thermal waves that are emanating from a surface.  It's a

19    visual movement of energy through -- through air that you

20    can discern by -- by seeing it.

21   Q. It's kind of like those -- like what you see like

22    the swirling of air when you look through volatile

23    chemicals like gasoline?

24   A. No, sir.  That would be vapor.  I would describe

25    it more closely to be the heat that would come off

26
```

Click Here & Upgrade
Expanded Features
Unlimited Pages
PDF
Complete

1     the -- the -- the hood of your car on a hot summer day.

2     Q. Heat devils I think I've heard?

3     A. (Witness shakes head negatively.)

4     Q. You've never heard that before?

5     A. No.

6     Q. Okay.  And -- and did you hear about a March

7      2005 event?

8     A. Yes.  In reviewing documents I did come to know

9      about a March 2005 event which I believe was an automatic

10     unwanted discharge from a -- a non-fire.

11    Q. Okay.  What -- what was your understanding of

12     what caused that discharge?

13    A. Only what I've read which -- that was perhaps a

14     short circuit on the detection line which caused the

15     automatic discharge of the system.

16    Q. And did you read that it was believed to have

17     been because the installation on the -- on the wiring had

18     worn through?

19    A. I don't remember the specifics other than it

20     was -- it was repaired and it involved a short circuit that

21     simulated a detection event that would have caused the

22     system to automatically discharge.

23    Q. And would that mean --  You don't remember the

24     term chafed wire in --

25    A. I --  Sorry.  I remember the term chafed wire,

26

Click Here & Upgrade
Expanded Features
Unlimited Pages
PDF
Complete
Documents

1       yes, sir.

2    Q. In -- in -- in association with that incident?

3    A. Yes.

4    Q. Okay.  Did you see any broken lines or wires,

5     cut lines or wires, or any -- well I'll just leave it at

6     that -- cut or broken wires or lines, by lines I mean

7     hoses, in your March 2006 inspection that you had not seen

8     in November?

9    A. Not that I recall.

10   Q. You would have taken a picture of those had you

11    seen those, right?

12   A. If I thought they were important but March

13    in -- but by March 2006 --

14   Q. Yes.

15   A. -- the focus of my inquiry was to determine why

16    the suppression system didn't operate manually when called

17    for by Mr. Hershberger.

18   Q. Okay.  Well wouldn't that include the scope of

19    the entire system?

20   A. Excuse me?

21   Q. Wouldn't -- wouldn't an analysis of that question

22    include the entire system, all the hoses running from

23    the one-ounce nitro to the -- down to the ten, from the ten

24    to the canisters?  Wouldn't it include all those lines?

25   A. Certainly the lines you just described, yes.

26



```
 1      Less important would be the distribution lines from the
 2      canisters or the extinguishers to the suppression nozzles
 3      recognizing the machine had been pulled down off a hill and
 4      it had been -- had been moved.  But the focus was why
 5      didn't the system discharge when Mr. Hershberger attempted
 6      to do so in August.
 7      Q. Okay.  Is it your belief that the one-ounce nitro
 8      bottle did not -- I don't know what the word would
 9      be -- explode, detonate, quickly release its contents when
10      he hit the plunger on the day of the fire?
11      A. My interview with Mr. Hershberger indicates that
12       it did not.
13      Q. Okay.
14      A. And that he because of his prior experience with
15       doing the same activity months before anticipated it to
16       respond the same way as it did previously.  Poorly stated.
17      Q. I understand what you were saying.
18      A. And -- and his --  My interview with him was it
19       was clearly a very different feel and he didn't discern the
20       same resistance or whoosh or discharge of pressure as he
21       had during the April discharge.
22      Q. What was the --  Go ahead.
23      A. That's fine.  Go ahead.
24      Q. What was the discharge of pressure he experienced
25       in April?
26
```

PDF Complete

Click Here & Upgrade
Expanded Features
Unlimited Pages

1    A. (No response.)

2    Q. And what I'm getting at is how can you -- how can

3    you say not having been there yourself whether that

4    discharge of pressure or whoosh of pressure was the

5    pressure coming from the activation of the larger bottles

6    and canisters as opposed to the one-ounce nitrogen bottle?

7    A. Based on his characterization of the difference

8    in the feel and operation of the manual plunger.

9    Q. Okay.  What -- what would you expect on -- on a

10   system that functions from the moment you --  If you had a

11   stopwatch or even a timer that was wired into it, from the

12   moment the plunger sends the pin through the top of that

13   one-ounce bottle how much time goes by before you start

14   seeing white powder spewing everywhere?

15   A. Quickly.

16   Q. Within a second?

17   A. I haven't done the calculations to time it but I

18   wouldn't use the -- the stopwatch to time it.  It would be

19   very quickly given the distance of hoses --

20   Q. Okay.

21   A. -- and the amount of pressure that should be

22   contained in the one -- what you're calling the one-ounce

23   cartridge or one-ounce cylinder and the distance to the

24   operators outside the -- outside the cab.

25   Q. Okay.

26

```
 1    A. So it's a pneumatic operator and given the

 2       configuration of how it functions it would be very quickly,

 3       virtually instantaneous for the purposes of your discussion

 4       I think.

 5    Q. And -- and -- and I guess you -- you wouldn't use

 6       a stopwatch with something like that because you couldn't

 7       get your thumb down twice fast enough, could you?

 8    A. I wouldn't see there would be any benefit in

 9       doing that.

10    Q. Okay.  So that from the -- from an operator's

11       standpoint, it might not be an engineer, if the system

12       discharges it's -- it's the total discharge that he sees

13       with the powder going everywhere, do you think that person

14       is also in a position to say -- to -- to differentiate

15       between a   one-ounce bottle going off and not activating

16       the rest of the system versus the whole system going off

17       like it's supposed to?

18    A. Yes.  Given his recent experience with operating

19       the plunger in the prior event and what he characterizes

20       the feel and the -- the fact that the plunger bottomed out

21       very quickly without any -- didn't take any force at all to

22       do that --

23    Q. Uh-huh (affirmative).

24    A. -- I think that difference is -- is telling and

25       important.

26
```

Click Here & Upgrade
Expand Your Features
Unlimited Pages
PDF
Complete
Documents

```
 1    Q. Did he say he had to apply a greater force the

 2     first time in -- in April?

 3    A. What he told me was the plunger felt different.

 4     It bottomed out easily.  There was no resistance.  It was

 5     different than before.  He hit it at least two more times

 6     before he exited the cab.

 7    Q. Do you --  Have you ever tried to manually set

 8     off a system like this?

 9    A. No.

10    Q. All right.  So you're not aware of any testing

11     that's been done, for example, to see how much -- how much,

12     for example, foot pounds of pressure you need to make

13     the plunger pierce the -- the seal on the one-ounce

14     nitro -- nitrogen bottle if the system is intact versus the

15     same operation if there's a hole in one of the hoses

16     feeding the ten-ounce bottles?

17    A. That's correct.  The only information I have on

18     that is Mr. Smith's testimony, it takes about 20 foot

19     pounds of force to -- to operate the -- the plunger.

20    Q. All right.  And -- and when you're saying, you

21     know, in March my focus was to look at the -- you know, why

22     the manual activation didn't work, is that to say I'm

23     really focusing on the firing mechanism area of the

24     machine?

25    A. Well in -- in March is when I became -- had the

26
```

1    opportunity to interview Mr. Hershberger personally --

2    Q. Right.

3    A. -- and gather more information.  I believe

4    Mr. Tijerina had spoken to him earlier.  And based on that

5    information I thought it was important for me to be -- have

6    a more detailed inquiry of him.

7    Q. Okay.  If the canisters still had content in them

8    and a lot, wouldn't that be relevant to why the system

9    didn't discharge as it was supposed to?

10   A. I don't understand that question.

11   Q. Well wouldn't that be a piece of the puzzle that

12   anybody trying to determine why the system didn't fire

13   properly or discharge properly, wouldn't that be relevant

14   to that analysis knowing that the canisters were -- had a

15   lot of powder still in them?

16   A. Well --

17   Q. Well let me --  Let's back up and do it this way.

18   A. Thank you.

19   Q. On a -- on a --  If the system had worked as it

20   was designed to and it -- it had discharged upon his

21   depressing the plunger, how much powder would you have

22   expected to find in the canisters on an inspection

23   afterwards?

24   A. If the system had functioned properly --

25   Q. Yes.

26


Click Here & Upgrade
Expand Your Features
Unlimited Pages
PDF
Complete

```
 1    A. -- less than was there.  Just a little -- a

 2     little left in the bottom of the container --

 3    Q. Okay.

 4    A. -- assuming all portions of the system were

 5     properly installed, were blown out and not plugged, the

 6     nozzles operated properly in all aspects of system function

 7     is intended.  Most of the suppressant contained in the

 8     container should have discharged through the distribution

 9     system, through the nozzles into the engine compartment.

10    Q. All right.  Have you ever worked a case where an

11     eyewitness' testimony did not square with the physical

12     evidence?

13    A. Sure.

14    Q. Okay.  The fact that there was as much content in

15     the canisters as there was would suggest to you that the

16     system did not fire properly, right, discharge completely?

17    A. That all of the agent did not discharge

18     completely, that's correct.

19    Q. Okay.  Now that doesn't mean that something in

20     the firing mechanism was the cause for that, right?

21    A. We know the system didn't discharge as it was

22     supposed to discharge, as it was intended to discharge both

23     manually or automatically prior to -- until later in the

24     event.  The cause of that I don't know what -- what it is.

25     I haven't been able to determine to a specific -- or a

26
```


Click Here & Upgrade
Expanded Features
Unlimited Pages

1    reasonable degree of certainty what -- what the cause is so

2    I agree with you in that regard.

3    Q. In other --  And all I'm trying to say is as we

4    try to rule out and rule in what could happen or, no, that

5    couldn't have happened, the fact that there was still

6    content, significant content of chemical in these canisters

7    doesn't mean that the nitro bottle did not go off, does it?

8    I mean because there could have been a rupture in a hose

9    between the two that would explain that, right?

10   A. There's --  Could be, you know, hypothetically

11   numerous causes why that would have occurred.  It could

12   have been the nitrogen bottle at the shredder was

13   undercharged or empty.  It could --  It could have been any

14   number of reasons why that wouldn't have occurred.

15   Q. Okay.

16   A. And as I indicated in my report based on the

17   information and changes to the system and information

18   available I wasn't able to determine what specific

19   cause -- what the specific cause was.

20   Q. Okay.  So the one-ounce nitro bottle not being

21   charged or full could be a cause?  Possibility?

22   A. That's one possibility.

23   Q. Okay.  And that that possibility could be the

24   result of either a service issue or the fact that

25   somebody -- that the -- that the seal had been broken

26


PDF Complete

Click Here & Upgrade
Expanded Features
Unlimited Pages

1    sometime before this fire?

2    A. If the seal was broken sometime prior to the fire

3    and the system was installed properly and maintain -- and

4    functioning the system should have discharged.

5    Q. What if there was a hole in the line between the

6    one-ounce nitro bottle and -- and the powder and it -- and

7    it went off?

8    A. That would be another possible reason why the

9    nitrogen from the one-ounce bottle wouldn't have reached

10   the nitrogen canisters associated with the -- nitrogen

11   cylinders associated with the canisters to allow them to

12   discharge.

13   Q. Sure.  So that's another possibility?

14   A. That's -- that's a possibility.

15   Q. All right.  Now let's talk about --  Well

16   if -- if somebody removes the one-ounce nitrogen bottle

17   from the cab and they -- and they get the cap off and

18   there's no release of gas, I mean it's dead, what would

19   that suggest to you?

20   A. It would depend on the condition at which time

21   they did that.

22   Q. October 4, 2005.

23   A. That wouldn't suggest anything to me

24   because -- because it -- the nitrogen could have leaked out

25   through some other -- some path.  So it would just indicate

26



1    to me there was no stored pressure between the nitrogen

2    container and the operators associated with the canisters.

3    Q. Okay.   Same thing:   As we go down to the

4    ten-ounce bottles that actuate the -- the canisters and

5    they go to take the cap off those and there's no whoosh or

6    sudden release of pressure, would that effectively indicate

7    the same thing that there was no stored gas in those

8    ten-ounce bottles anymore?

9    A. Sure because that stored gas is used as the

10   expellant for the -- for the extinguishing agent contained

11   in the extinguishers or the canisters we're calling them.

12   Q. Okay.

13   A. It's a stored pressure system --   It's not a

14   stored pressure system.   Excuse me.

15   Q. Right.   Let me take a look at your pictures

16   there.   And by that for the record I'm talking about the

17   ten pictures that you've identified as those which could

18   support Mr. Martin's testimony that between September

19   8th -- or between the time of the fire and November 11th

20   damage had been done to the machine, right?

21   A. Yes.   He pulled photographs that were -- that I

22   would have looked at when I read Mr. Martin's deposition as

23   to the areas he saw certain activities taking place.

24   Q. Okay.   And these are the -- these are the

25   photographs that you've pulled?

26

Click Here & Upgrade
Expanded Features
Unlimited Pages
PDF
Complete

1   A. That's correct.

2   Q. All right.  Now look at this --  Let me show you

3    these black-and-whites, Defendants' 1 and 2.  This was from

4    Mr. Tijerina's deposition.  Are a lot of the photographs

5    that you have pulled essentially the same area, these --

6    these bottles with the valves on them or the entry ports?

7   A. Some of them are.

8   Q. Okay.  Let's -- let's separate those then, okay,

9    because then we've got looks like another area.  And you

10   had --  What is that, a third area?  Let's just go ahead

11   and --  Okay.

12  You correct me if I'm wrong but of these ten

13   photos there are three which show an area depicting some

14   red canisters or bottles of some sort that look like

15   they're designed to be pressurized?

16  A. Those are the agent canisters, yes, sir.

17  Q. Okay.

18  A. And the associated nitrogen cartridges.

19  Q. All right.  With the lines that feed them; is

20   that right?

21  A. Correct.

22  Q. All right.  Now in all three of these photographs

23   there is a -- one of the lines is completely severed

24   through, right?

25  A. Correct.

26

PDF
Complete

Click Here & Upgrade
Expanded Features
Unlimited Pages

```
 1    Q. Okay.  And then --

 2    A. May I see it to make sure?

 3    Q. Sure.  And -- and in -- in one of the severed

 4     ends there's a lot of light or light-colored material.

 5     What is that?

 6    A. I would suspect that would be dry chemical agent.

 7    Q. Okay.

 8    A. Actually only two of these photographs are as you

 9     described them.

10    Q. Which one is not?

11    A. The last one.

12    Q. Let me see?  Why isn't that?  Isn't that hose

13     right there the fracture?

14    A. I'm sorry.  I thought you were referring to this

15     disconnected hose?

16    Q. Okay.

17    A. Okay.  Correct.

18    Q. All right.  So --  But you're saying that picture

19     in your hand -- in your left hand now actually shows a

20     second thing that is broken or not connected?

21    A. Not connected.

22    Q. And where is that?

23    A. (Indicating.)

24    Q. Okay.  And what is that --  What would you call

25     that?

26
```

```
1    A. I believe that's the discharge port from

2     the -- one of the agent canisters.

3    Q. On Defendants' Exhibit Number 1 from Mr.

4     Tijerina's deposition, is that this site right where I'm

5     pointing to, this connection?

6    A. Appears to be, yes.

7    Q. Okay.  So are you saying that the --  Where this

8     elbow fitting is going into the bottom of the tank, you're

9     saying those aren't connected or can you tell?

10   A. To study this a little closer I really can't

11    tell.  It may in fact be connected --

12   Q. Okay.

13   A. -- to that discharge port.

14   Q. All right.  And then two pictures are taken of

15    the one-ounce nitrogen bottle and the squib area to show

16    the bent pin in that -- in that connection and the fact

17    that the harness is disconnected, right?

18   A. That's correct.

19   Q. Okay.  Were they cut or just not plugged back in?

20   A. There is no cut in that photograph that

21    the -- not plugged back in and the pin is bent.

22   Q. Okay.  And then on the -- on the three photos we

23    had just been talking about, did it look to you like

24    this -- this line here was cut or just broke because of a

25    torque issue or some other issue?

26
```

Click Here & Upgrade
Expand Your Features
Unlimited Pages

PDF
Complete

1   A. It was separated and it was separated location as

2    described by Mr. Martin.

3   Q. Well how did that happen?  Mr. Martin said

4    someone took a pocket knife and cut them.

5   A. That may have been.  I wasn't there.

6   Q. Right.  But I --  What I'm asking you is as an

7    expert is that as you look at those -- that fracture site

8    is that consistent with -- the damage you see there

9    consistent with a knife cut?

10  A. I don't know that I've made that -- that -- that

11   discrete analysis of the surface characteristics of that

12   separation.  The orientation of the hoses relative to each

13   other as -- as compared to -- to other photographs and

14   Mr. Martin's testimony was, okay, well that must be the

15   area that he was describing when -- in his testimony.  I

16   haven't studied that to determine if it was a -- made by a

17   knife or -- or some other sharp tool or some other method.

18  Q. Did -- did you --  Did you read in Mr. Martin's

19   deposition where he said that the two guys he was talking

20   about didn't bring any tools with them and that they cut

21   lines so they could take the canisters out?

22  A. I do remember him saying that, yes, sir.

23  Q. And would -- would -- would cutting that line

24   enable them to take a canister out?

25  A. Yes.

26

Click Here & Upgrade
Expanded Features
Unlimited Pages
PDF
Complete
Documents

1    Q. I mean isn't it still connected at the bottom?

2    A. In that photograph it is.

3    Q. Okay.  Well that was taken on -- in November,

4     right, --

5    A. Correct.

6    Q. -- this photograph?  So it was taken after the

7     October visit?

8    A. Correct.

9    Q. Okay.  All right.  So the edges of that fracture

10    site look all worn and like -- like they were brittle at

11    one time and there's a bunch of flaking on the edges,

12    right?

13   A. The photograph shows what it shows.

14   Q. Well I mean can you -- is -- is what I said not

15    accurate?

16   A. No.  I --  Like I said, I haven't studied the

17    surface areas of those -- of those hoses for any analytical

18    purposes as to what tool may have been used, if any, to

19    cause that separation.

20   Q. That separation is just as consistent with

21    somebody leaning on it, isn't it, if those hoses were in a

22    brittle condition?

23   A. Again, I haven't studied that --

24   Q. Okay.

25   A. -- in any detail.

26


Click Here & Upgrade
Expand Your Features
Unlimited Pages
PDF
Complete

54

```
 1    Q. All right.

 2    A. As --  Other than the location as testified to by

 3     Mr. Martin.

 4    Q. Okay.  Now you've -- you've got two pictures that

 5     look like a bracket and a U-bolt with some nuts on them

 6     that I guess are designed to hold one of the tanks in

 7     place; is that right?

 8    A. Correct.

 9    Q. Is that a -- is that a regular fire extinguisher,

10     that one, or is that one of the canisters, the red tank?

11     Do you remember what kind of tank that was?

12    A. I believe it's a -- one of the canisters.

13    Q. Okay.  Where was that on the machine; do you

14     remember?

15    A. It's on the deck outside of the operator's cab.

16    Q. And what appears to be broken to you?

17    A. Nothing appears to be broken.  The -- the nut

18     holding the U-bracket appeared to be -- be loose so I -- I

19     took photographs of that loosened.

20    Q. Okay.  Do you know how far tight would have been?

21    A. (No response.)

22    Q. I mean I'm trying to get an idea of how loose it

23     was.  Would -- would a quarter turn have tightened it or

24     are we talking about a big distance?

25    A. I -- I think you can get a sense of that by

26
```


PDF
Complete

Click Here & Upgrade
Expanded Features
Unlimited Pages

1    looking at the thread -- the thread travel indications on

2    the -- on the bare threads on the inside of the bracket and

3    the space between the U-bolt and the surface of the

4    canister.  I haven't studied that in great detail but it

5    appears to be four or five threads perhaps.

6    Q. But can we also get an indication of that

7    on -- because of the wear on the side of the canister that

8    this looks like something that probably resulted from

9    vibrations over a period of time?

10   A. I'm not sure that that's true or that would just

11   be markings from the insertion and removal of that canister

12   when it was recharged.  I haven't studied that in great

13   detail.

14   Q. Okay.  Can -- can these fasteners come loose

15   because of vibrations?

16   A. They probably shouldn't because they're

17   designed -- the support of those structures are designed

18   for installation in heavy equipment which gets a lot

19   vibration.  And it appears to be a locking type bolt if

20   properly torqued and installed but I guess in certain

21   circumstances it -- it -- it's a possibility but it

22   shouldn't happen.

23   Q. Would you think that an operator would hear that

24   rattling?

25   A. I haven't studied it -- there -- how much

26

Click Here & Upgrade
Expanded Features
Unlimited Pages
PDF
Complete

```
 1     rattling it would -- whether it would rattle or not.

 2     Q. Okay.

 3     A. It's just an observation when I --

 4     Q. I understand.

 5     A. -- did my site investigation.

 6     Q. I -- I just want to be sure I cover all the

 7      bases.  All right.

 8     And then you've got two pictures showing it looks

 9      like a hose but then there's something else smaller that's

10      coming from behind it.  It looks like a hose that comes

11      from the cab, out the cab, and then onto the decking

12      somewhere; is that right?  You tell me where that is?

13     A. It appears to be a distribution hose --

14     Q. Okay.  And is --

15     A. -- given its size.

16     Q. And is that coming from the cab?

17     A. I don't recall.

18     Q. What is --  You don't know what that apparatus

19      is, the square kind of metal framework behind it?

20     A. I don't know if it's going into the cab or if

21      it's -- it's passing near the cab, is -- is my point.

22     Q. Okay.  Why would a line just pass the cab as

23      opposed to come out of it from the manual activator; do you

24      know?

25     A. I don't believe I said that was a manual

26
```


Click Here & Upgrade
Expanded Features
Unlimited Pages

1      activator line.

2    Q. No, I didn't -- I didn't say you did.  I'm

3      asking -- you said --

4    A. I'm sorry.

5    Q. You said you couldn't tell whether it was a line

6      that just passed the cab or whether it was coming out of

7      the cab, right?

8    A. The photograph that I had in my hand at

9      the time, --

10   Q. Yes.

11   A. -- yes, sir.

12   Q. Let me get the one.  Where is it?  These two

13     photographs, right?  Well I just picked these up because I

14     was going to ask you a question.  But look at any of them

15     you want.  I don't think they're going to help you but...

16   A. I believe that may, in fact, be the

17     line -- the -- the line going into the floor of the cab to

18     the manual actuator.

19   Q. What is the thing that's running --  I see a hose

20     and it looks like a severed hose but then there's a -- a

21     metal or something, silvery metallic looking line there.

22     What is that?

23   A. I suspect it's the -- it's the detection line

24     going to the squib harness.

25   Q. Okay.  So a wire?  Is it the electrical wires?

26


Click Here & Upgrade
Expand Your Features
Unlimited Pages
PDF
Complete

    1    A. Yes.

    2    Q. I mean you tell me.  What -- what words would

    3     you use?

    4    A. Wire is fine.

    5    Q. Okay.  For example, on the squib, there's the

    6     squib harness coming from the top down, right?  Or is this

    7     it down here?

    8    A. That's the squib harness.

    9    Q. Okay.

   10    A. That's the --

   11    Q. What is this up here?

   12    A. I don't recall.

   13    Q. Okay.  So you think that this silver -- or

   14     you --   I'm not trying to be unfair.  I'm really -- I'm

   15     just trying -- is that --  Would you call that silver?

   16    A. Silver is fine.

   17    Q. Okay.  That line I'm pointing to, do you believe

   18     that would be the same line coming from this squib harness?

   19    A. I believe so.

   20    Q. Okay.  And that that hose would be this hose that

   21     connects just below where the squib harness would typically

   22     connect?

   23    A. Correct.

   24    Q. Okay.  All right.  And I see that they are

   25     severed.  Obviously you -- you point that out.  Do you see

   26

Click Here & Upgrade
Expanded Features
Unlimited Pages

PDF
Complete

1    anything about how they're --  Well was the wire severed or

2    just the hose?

3    A. At that location doesn't appear the wire is

4    severed.

5    Q. Okay.  And does the hose where it's severed

6    appear to you to be a fracture that was caused by somebody

7    cutting it with a knife?

8    A. Again, I haven't studied the surface area to

9    determine if it's a hard cut or some other fire induced

10   damage or something else.

11   Q. How would you do that?

12   A. I haven't considered how I would do that.  I

13   don't know.

14   Q. Okay.  Do you -- do you -- do you ever do any

15   forensic examinations where you have to send the work out

16   to a lab to do?

17   A. I have had to involve labs in some of my work,

18   yes.

19   Q. Okay.  Do you ever send a -- stuff out for

20   electron microscopic kind of --

21   A. Microscopy?

22   Q. Yes.

23   A. There have been times where that's been used.

24   Q. Okay.  All right.  Now aside from finding

25   photographs that appear to be --  Well let me take that

26

1    back too.  You -- you correct me if I'm wrong.  I'm -- I

2    really am just trying to get the truth.  I understood you

3    to say these were pictures you pulled because they were

4    pictures that showed areas where Chris Martin had said in

5    his deposition that he saw these guys cutting.  Is that

6    accurate?

7    A.  Yes.

8    Q.  Okay.  So you recall in -- in Chris Martin's

9    deposition him talking about cutting lines up near the cab?

10   A.  No.  Actually he -- he was talking about cutting

11   lines near the canisters.  So I wouldn't put these two

12   photographs in that category.

13   Q.  Okay.  Then there was --  What -- what is this a

14   picture of here, the one you're looking at now?  I see a

15   severed hose but I -- I don't know where it is.

16   A.  That's in the engine compartment and -- and

17   that's why I set it in this pile because I believe

18   Mr. Martin testified in his deposition he saw them cutting

19   hoses near the -- near the canisters if I recall correctly.

20   Q.  Okay.  So near the --  Do you recall him saying

21   that he saw them cut a hose in a -- or saw them cut a wire

22   real close to the battery lead?

23   A.  Yes.

24   Q.  Okay.  Did you find any cut or fractured wires

25   near the battery leads?

26

Click Here & Upgrade
Expanded Features
Unlimited Pages
PDF
Complete

1    A. I don't have any photographs of that, no.

2    Q. Okay.  And this shaft here where -- what -- what

3     shaft is that there?  Do you see what I'm talking about?

4    A. I don't know what shaft that is but this is

5     inside the -- inside the compartment --

6    Q. And I'm --

7    A. -- of the engine compartment.

8    Q. What I guess I'm trying to get at is there

9     anything about that picture that would orient you to

10    indicate where in the compartment that is?

11    A. With other photographs you may be able to

12     but not --

13    Q. Okay.

14    A. -- standing by itself.

15    Q. Okay.  All right.  What is this big structure on

16     the top of that picture?

17    A. It looks like a -- it could be a header cover.

18     I'm not sure.  I would have to --

19    Q. Okay.

20    A. -- review the other photographs to locate it any

21     better than that.

22    Q. Are you able just to --  Are you able to look at

23     this picture the -- and even orient it in terms of which

24     way the photographer -- you know, which way is up in terms

25     of where the photographer was standing?  Well you were the

26

Click Here & Upgrade
Expanded Features
Unlimited Pages
PDF
Complete

```
 1    photographer.  In terms of where you were standing?

 2    A. I believe it's pointing down based on the lower

 3     left-hand corner of what appears to be ground but, again, I

 4     would have to refer to other photographs to be really

 5     accurate about that.

 6    Q. So hold it in the way you think it's correctly

 7     oriented, if you would?

 8    A. Again, I'm not comfortable doing that.

 9    Q. Okay.

10    A. And -- and --

11    Q. You can't tell?

12    A. That's correct.

13    Q. Okay.  All right.  Tell me what were --  Do you

14     have any opinions as we sit here today that the fire

15     suppression system on this machine was manufactured

16     negligently?

17    A. No.

18    Q. Do you have an opinion today that the fire

19     suppression system was designed negligently?

20    A. No.

21    Q. Do you have any opinions that would support a

22     notion or finding that AFEX acted negligently in any way?

23    MR. MILLER:  Objection to the form.  Go ahead.

24     BY THE WITNESS:  (Resuming)

25    A. I believe AFEX in their October inspection didn't

26
```


Click Here & Upgrade
Expand Your Features
Unlimited Pages
PDF
Complete
Documents

```
1    undertake that inspection as they should have.

2    Q. Okay.  I'm sorry.  And we'll get to that.  Bad

3     question.  Do you have any opinions whether AFEX did

4     anything negligently prior to the fire?

5    A. No.

6    Q. Okay.  You have no opinions about that?  And as I

7     understand it you have no opinions about that in part

8     because the machine had been altered or affected in such a

9     way that you believe you couldn't get a fair read of -- of

10    the system?

11   A. I believe that contributed to that, yes, sir.

12   Q. Okay.  Another cause for that might just be the

13    extent of the destruction of the machine because of the

14    fire itself; is that right?

15   A. Certainly anytime there's fire damage to a piece

16    of equipment or a -- or a structure that plays a role in

17    the available information post fire.

18   Q. When you just said that potential altering or

19    changes in the status of the machine could be a

20    contributing factor to your not being able to develop an

21    opinion, what are the other contributing factors that you

22    might have had in mind?

23   A. Certainly any disturbing of the -- of the

24    evidence or the scene or the site that occurs after the

25    fire has been extinguished and overhauled by the

26
```



```
 1      fire department.

 2   Q. Does --  Is there a lot of pressure from a pump?

 3    Would they have used dry chemical or water; do you know?

 4   A. I would suspect they would have used water.

 5   Q. Okay.  And that comes out pretty high-pressure?

 6   A. It can.

 7   Q. Okay.  And for some --  And is it your

 8    understanding this fire had burned a long time and very

 9    hotly before the fire department got there?

10   A. As described the -- the compactor was heavily

11    involved in fire upon the arrival of the fire department.

12   Q. Okay.  Would it be fair to say that certain parts

13    would have been more brittle by that point when the fire

14    department got there or more susceptible to damage because

15    of pressure -- pressurized water being placed on it than

16    they would have been had the fire not occurred?

17   A. I think that's fair.

18   Q. Okay.  Are you aware of any evidence in this case

19    that shows that any of these items that you've shown here

20    in your photographs, the ten pictures, were not broken or

21    fractured at some -- at some point after the fire but

22    before these pictures were taken?

23   MR. MILLER:  I'll object to the form.

24   MR. ALLRED:  Okay.

25    \

26
```



```
1     BY MR. ALLRED:   (Resuming)

2     Q. Is that --

3     A. Try that again, please?

4     Q. Sure.   You showed me these pictures of things,

5      well look at this hose is broken, look at that -- you know,

6      that one.   And I guess what I'm asking you is do you have

7      any photographic evidence or other evidence to indicate

8      whether this damage, any of this damage you're showing me,

9      occurred after the fire and not as a result of the fire?

10    A. I believe Mr. Tijerina informed me -- has

11     photographs showing that some of these conditions did not

12     exist during his earlier inspection of the machine when I

13     was not in attendance.  He informed me, well, in October

14     this is different than when he left it.

15    Q. Okay.  Did he -- and did he --  Well he was with

16     you during your inspection, right?

17    A. Correct.

18    Q. Did he point out those places like your -- your

19     picture of the canisters with the fractured lines right

20     above the canister, did he point that out to you?

21    A. He may have.  I don't recall specifically what

22     areas he pointed to but he -- he certainly observed that it

23     was different.

24    Q. Okay.  Well and -- and in that regard I mean

25     wouldn't that -- was there some sort of ex -- I don't know,

26
```


**PDF**
**Complete**
Click Here & Upgrade
Expanded Features
Unlimited Pages
Documents

1    not bad expletive but just communication of surprise, look,

2    hey, this is broken, this wasn't broken before?  Do you

3    remember any sort of statement like that from Mr. Tijerina?

4    A. I don't recall a specific statement but I think

5    he was surprised that it had changed.

6    Q. Okay.  And -- and -- and that was with regard to

7    what's depicted in these three photos of the hose with what

8    might be the discharge powder in one of the ends, right?

9    A. Again, I don't recall specifically what

10    point -- areas he pointed out to me but those -- that would

11    be among them I think.

12    Q. So --  Okay.

13    A. Because we got to those photographs from

14    Mr. Martin's deposition.

15    Q. Right.

16    A. Not from any obser --

17    MR. ALLRED:  Yeah.  He's -- he's right.

18    MR. MILLER:  Okay.

19    BY MR. ALLRED:  (Resuming)

20    Q. These were the ones he pulled when -- when he was

21    identifying damage after he had read Mr. Martin's

22    deposition?  That's why we have these ten pictures on the

23    table, right?

24    A. Correct.

25    Q. Okay.  And -- and so now as we talk about what

26



```
 1        did Mr. Tijerina show you, hey, that's not the way it was

 2        on September 8, you can't tell me for certain which of any

 3        of these or others were -- that -- that he told you about?

 4     A. Correct.  That would --  Mr. Tijerina would be

 5        better equipped to say that.

 6     Q. Okay.  Now if Mr. Tijerina identifies only the

 7        hose that's on top of this canister in these three photos

 8        and the squib harness not being connected with the pin

 9        bent, do you remember any other areas he showed you besides

10        those two?

11     A. As I've answered I don't remember specifically

12        what areas he would have showed me.

13     Q. Okay.  I'm nailing you down to make sure we got

14        that on record.

15     All right.  All right.  Is there any way to know

16        by the condition of some of the machine components how hot

17        the fire got?

18     A. There's a --  Yes, you can use some of

19        that, sure.

20     Q. I mean some of the components melt at higher

21        temperatures or deform at higher temperatures than

22        others, right?

23     A. Correct.

24     Q. So you could at least come up with a

25        range, right?

26
```

1    A. That's correct.

2    Q. Okay.  And has -- have you undertaken to do that

3     at all?

4    A. I have not.

5    Q. Okay.  For instance, would you imagine there's a

6     temperature at which braided steel hoses even become

7     brittle?

8    A. Not as you've asked that question.  Temperature

9     on braided steel hoses become -- would become softened and

10    would lose their -- and then subsequently may become

11    brittle but while heated they wouldn't necessarily become

12    brittle.

13   Q. You're right.  Let me withdraw the question.

14   Is there a temperature at which a braided steel

15    hose would get so hot that once it cooled to ambient

16    temperature of Camden County, Georgia in the fall that it

17    would be brittle?

18   A. The effects of fire can embrittle components and

19    I would expect rubber jacketed hose with steel braiding

20    inside would be among them.

21   Q. Would -- would -- would this hoses that

22    are -- the rubber jacketed braided steel hoses be by

23    appearance similar to the hydraulic lines on the compactor?

24   A. I don't know.

25   Q. They're both pressurized hoses, right?

26


Click Here & Upgrade
Expanded Features
Unlimited Pages
PDF
Complete

```
1    A. Correct.

2    Q. Okay.  So if I understand your testimony so

3     far -- you don't --  Well let -- let me strike that.

4    Do you have any opinions as -- that would

5     indicate that IST or John Murray doing business as

6     Integrated Systems Technology was negligent?

7    A. I believe there's evidence that Mr. Murray and

8     IST failed to follow the recommendations contained in NFPA

9     17 and in the related AFEX manuals concerning his

10    recharging and inspection of the systems.

11   Q. Okay.  And -- and you've got that bulleted in

12    bullet points in your conclusions, right?

13   A. I believe so, yes, sir.

14   Q. So, for example, you've got with regard to the

15    April 26, 2005 work by AFEX, number one, conducted this

16    work in accordance with the maintenance requirements of

17    NFPA 17 and the AFEX 2000 Installation and Maintenance

18    Manual.  In other words, that's what they should have done,

19    right?

20   A. Correct.

21   Q. What is the evidence you have that they didn't?

22   A. No document that I have seen indicates that

23    information provided to Camden County was consistent with

24    those requirements as the recommendations for maintaining

25    the system.

26
```


Click Here & Upgrade
Expand Your Features
Unlimited Pages
PDF
Complete
Documents

1   Q. Would that be kind of like an -- an inspection

2    report?

3   A. That would be kind of like an inspection report

4    with recommendations and other information as indicated in

5    the AFEX Manual and in NFPA 17.

6   Q. Okay.  Have -- have you seen this?  This

7    is -- this is from the automatic discharge episode

8    that -- where there was no heat plume or fire related of

9    March 2005.  It's an inspection report by IST.

10  A. I -- I did just see this.  I saw mention of this

11   in one of the depositions and I just -- just did see this.

12  Q. Do you see in March at the bottom that, you know,

13   he's got these little blanks he ticks off and at the very

14   bottom it says -- and I forgot the term -- what -- what

15   kind of manual?

16  A. Service.

17  Q. Service manual and it says -- it has a choice of

18   acceptable or not acceptable and it says --  And, in fact,

19   that's the only one ticked off as not acceptable, right?

20  A. Yes.

21  Q. Okay.  And this was provided to us by Camden

22   County which means they got it.  Well whose responsibility

23   is it to get the manual if there isn't one?

24  A. I think it's the responsibility of Integrated

25   Systems to inform them that not only is the manual required

26

1     but the reason the manual is required which is that there

2     are maintenance requirements and inspection requirements

3     for the  suppression system.

4     Q. Okay.  How do you know that wasn't done on

5     for -- on, for example, March 14, 2005?

6     A. There's no indication this -- in this document

7     and I see no testimony that that information was conveyed

8     to Camden County.

9     Q. Okay.  All right.  All -- all you see is that

10    obviously well Camden County has at least notified that

11    there isn't a service manual or the service manual is in an

12    unacceptable condition?

13    A. Correct.

14    Q. Okay.  And the service manual was -- itself would

15    then have the verbiage about how to inspect and what's

16    required by way of inspection, right?

17    A. Yes, it would.

18    Q. Okay.  Did you ask anybody associated with Camden

19    County why after March 14, 2005 they did not undertake to

20    try to get a service manual?

21    A. No, I asked Mr. --

22    Q. Brant?

23    A. No.

24    Q. Martin?

25    MR. MILLER:  Martin?

26

1    BY THE WITNESS:   (Resuming)

2    A. -- thank you -- Mr. Martin whether or not he had

3     any manuals or information on the suppression system during

4     my November inspection and he --

5    Q. And he said no?

6    A. -- informed me did not.

7    Q. Okay.   And -- and was there any discussion at all

8     about what he might or might not have -- what -- what he

9     did to try to get one?

10   A. No.   I also asked him for any records that they

11    had on the inspection and testing and -- and service of the

12    suppression system ongoing as well as the associated with

13    prior system trips that he relayed to me occurred.

14   Q. Okay.

15   A. And it was from that discussion that I received

16    the documents we looked at earlier concerning the April

17    20th repair to the -- to the compactor.

18   Q. And was that a purchase order requisition

19    or -- let me --  Well hold on there.  Let me withdraw it

20    and I'll just -- or an invoice rather -- let me get you...

21   All right.  Here's an invoice that Mr. Miller

22    provided me for April 26, 2005.  That's in your notebook,

23    isn't it, or I mean your folder?

24   A. This document I became aware of is an attachment

25    to the Engle Martin report.  This is not the document I'm

26


Click Here & Upgrade
Expanded Features
Unlimited Pages
PDF
Complete
Documents

```
 1     referring to.

 2     Q. That's not the document?

 3     A. That was provided to me by Mr. Martin.

 4     Q. Okay.  That's not the document you're

 5      referring to?

 6     A. It is not.

 7     Q. Okay.  What -- what -- what sort of document

 8      was it?

 9     A. It was an invoice indicating the date of his

10      purchase of items needed to repair the compactor after the

11      April event.  It was from that document I was able to get

12      a -- a general timing of when that event occurred.

13      Specifically it was a invoice for hydraulic hose and two

14      crimps on April 20th, 2005.

15     Q. Well and --  So let me -- let me see if

16      I'm -- I'm straight on this.  You're aware of a March

17      incident in 2005 where there was not a heat plume or a

18      fire, right?

19     A. Only from what I reviewed in the record that that

20      there was a -- and what you just showed me in the

21      inspection report, a system recharge in March 14th of 2005.

22     Q. But you don't remember Mr. Martin or one of the

23      other Camden County employees who's -- who have been

24      deposed testifying that there was a dry fire or -- or an

25      automatic discharge of the system in the Spring of 2005

26
```



1    that was not -- not associated with a heat plume or at

2    least they thought it wasn't?

3    A. Yes, I recall that.

4    Q. Okay.  Outside of the fact that there's a

5    document in front of you, you recall that separately from

6    the document?

7    A. That's correct.

8    Q. Okay.  And then you -- you obviously recall

9    Harshberger (sic) telling you -- or Hershberger telling you

10   about an April 2000 fire heat plume where he manually

11   activated the system?

12   A. Correct.

13   Q. And that the system -- IST came out to recharge

14   the system, right?

15   A. Correct.

16   Q. All right.  And then --  And we've been provided

17   with this today.  This is dated May 9, 2005 for a CAT 826G,

18   Lannie Brant, recharge kit, inspect, test, and repair,

19   purchase order requisition.  Were there -- were

20   there --  It's a purchase order from Camden County?

21   A. (Witness shakes head negatively.)

22   Q. What --  Okay.  Never mind.  I'm going to

23   withdraw that.  That looks like what they're doing is

24   asking to get money to pay the April 26th invoice?

25   MR. MILLER:  Exactly.

26



```
1    MR. ALLRED:  Okay.  All right.

2    THE WITNESS:  Could I take a -- my turn for a

3     restroom break?

4    MR. ALLRED:  Yes, absolutely.

5    (Whereupon, a brief recess was taken.)

6     BY MR. ALLRED:  (Resuming)

7    Q. Do you have some sort of opinion about what

8     Camden County should have inspected for that would have

9     prevented this fire if they would have known they were to

10    have inspected?

11   A. Prevented the fire?  Want to rephrase that or...

12   Q. Well, in other words, --  We can do it in little

13    piecemeal.  I mean you've just testified that you thought

14    IST was negligent because they didn't adequately notify

15    Camden County that they had certain inspection procedures

16    that they needed to go through, true, or -- or is it just

17    that they needed to tell them about that the manual told

18    them -- would have told them those things?

19   A. That there was requirements and recommendations

20    for the inspection and maintenance of the suppression

21    system --

22   Q. Okay.

23   A. -- both contained in AFEX documents and in

24    related NFPA standards.  That includes both owner's

25    inspections associated with daily and monthly visual

26
```


Click Here & Upgrade
Expanded Features
Unlimited Pages
Complete

1    inspections as well as regular tests and inspections by a

2    qualified service contractor such as Integrated.

3    Q. Are you aware that Integrated had offered Camden

4    County a contract servicing -- or a servicing contract?

5    In -- in other words, I -- IST saying I'm not just going to

6    come out with piecemeal when you call me, if you will give

7    me the servicing contract I'll come out there and service

8    the machine as it's supposed to be serviced.  Are you aware

9    that IST or Integrated made that offer to Camden County?

10   A. I am not.

11   Q. Okay.  And then you're also aware that Camden

12   County rejected that, right?

13   A. I'm not aware of an offer or a rejection.

14   Q. Okay.  Do you have an understanding one way or

15   the other whether Camden County employees were not

16   inspecting their machine, the 826G and specifically the

17   fire suppression system on it as they were required to do

18   by the manual?

19   A. Mr. Martin's testimony was they were not

20   inspecting the fire suppression system per the

21   recommendations of the manual.

22   Q. Okay.  Now if IST had given them more notice than

23   he did that they needed to get a manual or told them, you

24   know, that you need to get that manual because it tells you

25   about the importance of inspection issues and Camden County

26


Click Here & Upgrade
Expanded Features
Unlimited Pages
Complete

1    went and got it and they performed those inspections,

2    do you have an opinion that that would have prevented

3    the fire?

4    A. I have no information that that would have

5    prevented the occurrence of the fire, no.

6    Q. And that will be because you don't know what

7    caused the fire?

8    A. That would be correct.

9    Q. Okay.  All right.  And then on number two it says

10   IST or Integrated I think you're calling them should have

11   provided substantive written information to Camden County

12   concerning the inspection and repair including a

13   maintenance report and recommendations such as the need for

14   owner inspections, regular maintenance, and related service

15   and inspection documentation.  So that kind of runs hand in

16   hand with the NFPA 17 requirement we were just discussing?

17   A. It does.

18   Q. Okay.  It -- it amounts to the same thing saying

19   that IST should have told them they needed to get the

20   manual because it would have given them the inspection

21   criteria they needed to follow?

22   A. Inspection and service, correct.

23   Q. Okay.  All right.  Are you critical

24   of -- I --  But prior to the fire -- or, you know, per

25   their actions prior to the fire of August 9, 2005, are you

26


Click Here & Upgrade
Expanded Features
Unlimited Pages
PDF
Complete

1    critical of Integrated for anything else?

2    A. Prior to the fire...

3    Q. Let me rephrase it.

4    A. Thank you.

5    Q. Did -- did Integrated do anything prior to the

6     fire of August 9, 2005 besides these points you've

7     mentioned on page 8 of your report that you think

8     contributed to the fire?

9    A. Not that I'm offering opinion on, no, sir.

10    Q. Okay.  Now would it be accurate to say that all

11     other opinions you have about AFEX and Integrated about

12     what they did pertain to their conduct after the fire and

13     their October inspection of the machine?

14    A. Yes, sir.

15    Q. Okay.  And -- and in a nutshell is that that

16     they -- they went in without a protocol and they conducted

17     testing on the machine that disturbed it?

18    A. In a nutshell and -- and they should have

19     followed the -- at a minimum the -- if they were going to

20     disturb it and do an inspection the inspection criteria and

21     guidance provided in the AFEX manual for such work.

22    Q. How do you know they didn't?

23    A. I saw in the documentation that they did.  I saw

24     no information that the information on the checklist was

25     filled out or any of the information was provided as part

26


PDF
Complete

Click Here & Upgrade
Expanded Features
Unlimited Pages

1      of the investigation.

2      Q. Okay.  What checklist are you talking about?

3      A. The fire investigation procedure contained in

4       Chapter 9 of the AFEX Technical Reference Manual.

5      Q. Okay.  So it's your opinion, hey, look October 4

6       you guys went out and did that inspection, there should be

7       a checklist here of what you did?

8      A. The information contained in here should

9       have -- should have been acquired and -- and documented and

10      I see no information that it was.

11     Q. Okay.  Does that --  Does the technical reference

12      manual say that for an inspection they should not open up

13      canisters to look inside or things of that nature?

14     A. No, it does not.

15     Q. Okay.  Does it say that they should not unplug

16      the squib harness?

17     A. No, it did not.

18     Q. Just that they should document what they do?

19     A. It provides a fire investigation procedure --

20     Q. Okay.

21     A. -- which they should have followed.

22     Q. Is there a --  And -- and absent documentation

23      from them you don't know whether they followed it or not,

24      right?

25     A. Only to the extent that Mr. Smith and Mr. Latham

26


Click Here & Upgrade
Expanded Features
Unlimited Pages

```
 1    testified as to what they did do --

 2    Q. Okay.

 3    A. -- during their inspection of the machine in

 4    October.

 5    Q. So --  And -- and just from memory --  I mean

 6    pull for me from your memory.  I mean give me an example of

 7    what Mr. Smith said that was done or not done during the

 8    inspection of October that is not in compliance with the

 9    checklist?

10    A. He didn't interview any operator or witnesses as

11    an example --

12    Q. Okay.

13    A. -- which is an important piece of information

14    when conducting an investigation as to what information can

15    be discerned from those eyewitnesses.

16    Q. And -- and does it -- does the manual say to do

17    that before you conduct the inspection?

18    A. As part of the investigation procedure.

19    Q. Okay.  All right.  And anything else that you can

20    think of?

21    A. I think the document speaks for itself in regard

22    to what activities should have been done during the October

23    inspection if a destructive -- destructive examination was

24    being taken.

25    Q. And tell me about that, what -- what in -- what

26
```

Click Here & Upgrade
Expanded Features
Unlimited Pages
PDF
Complete
Documents

1       in your opinion about the October 4, 2005 inspection was

2       destructive?

3    A. The information testified to as -- by Mr. Martin

4       and as to the disturbing of and -- and breaking of hoses

5       and perhaps wires and Mr. Martin testified that the

6       canisters were -- were moved and disturbed.

7    Q. Okay.  And do you remember actually Mr. Martin

8       testified that Mr. Smith uncapped the canisters and poured

9       the contents out on the ground?  Do you remember that?

10   A. I believe he testified that he shook them.

11   Q. You don't remember he testified he spilled the

12      contents out on the ground?

13   A. I think -- I think there was some discussion

14      about that, yes.

15   Q. All right.  But they were -- they were -- had a

16      lot of content in them when you saw them in March?

17   A. They did.

18   Q. Do you think somebody came back in between

19      October of 2005 and March 2006 and filled them back up

20      again?

21   A. No.  The material was -- was caked when I saw it

22      in October and it may well have been caked at the time Mr.

23      Smith attempted to do that so it may not have dislodged or

24      fallen --

25   Q. Do you think --

26



1    A. -- out to a great degree.

2    Q. Okay.  Do you -- do you -- do you believe

3     Mr. Smith did that at all?  Do you believe he actually

4     shook the canisters upside down and emptied contents of it?

5    A. Mr. Smith denies that that occurred.

6    Q. Okay.  And I guess you would have no opinion

7     about whether it happened or not?

8    A. I haven't formed --

9    MR. MILLER:  Objection as to form.  Go ahead.

10    BY MR. ALLRED:  (Resuming)

11    Q. Do you?

12    A. No.  I -- I haven't judged one over the other.

13    Q. Okay.  Is it possible Mr. Smith shook the

14     canisters just to see how caked the contents were?

15    A. I suppose that's --

16    MR. MILLER:  Objection as to form once again.

17    Go ahead.

18    BY THE WITNESS:  (Resuming)

19    A. I suppose that's a possibility, sure.

20    Q. Okay.  Would you be interested to know that

21     inspecting the system?

22    A. That would be one of the things that you would

23     look at, sure.

24    Q. Okay.

25    A. But I would add that it should be done in -- in a

26



```
 1    controlled cooperative manner so it's -- the information is

 2    understood and available to everybody.

 3    Q. Okay.  Is there a protocol in that regard for

 4    fire inspections?  Like is there an ANSI standard, a

 5    national fire inspectors or fire protection engineering...

 6    A. Well there's an NFP -- NFPA document on fire

 7    investigation.  I'm not a fire investigator but NFPA 921 is

 8    a recognized standard for -- or practice I should say for

 9    conducting fire investigations.

10    Q. Okay.  And does it say you've got to wait until

11    the group gets there before you start touching things?

12    A. I would refer --  I would defer to Mr. Tijerina.

13    I haven't studied that document for the purpose of

14    this case.

15    Q. Okay.

16    A. I don't know.

17    Q. Well when you were there in November did you

18    lift -- did you lift up on the plunger?

19    A. No.

20    Q. Okay.  Did you touch anything?

21    A. Yes.

22    Q. What?

23    A. I removed and looked at the condition of the

24    cartridge throats and I believe I looked at the canister

25    contents.

26
```

1    Q. In November?

2    A. No.  I believe I did that later actually.

3     I -- I -- I don't recall.

4    Q. Okay.  Could be one or the other; you just don't

5     remember?

6    A. I don't remember.

7    Q. Okay.  And when you looked in -- at the canister

8     contents that you're talking about, is that when you saw

9     that they had a lot of content and that the content was

10    caked?

11   A. Yes.

12   Q. Okay.  And did you notice that the seals at the

13    bottom had been partially blown?

14   A. I believe I observed that, yes.

15   Q. Okay.  Do you believe that this system, the

16    fire suppression system, discharged in the

17    way -- discharged --  Strike that.

18   I don't know how to word this.  Do you believe

19    that this fire suppression system discharged because of a

20    detonation of the squib at the one-ounce nitrogen bottle?

21   A. I -- I don't know.  And it -- it's possible but

22    it's also possible it discharged because of a thermal

23    attack on the nitrogen canisters associated with the

24    extinguishers.

25   Q. And those would be the ten-ounce bottles, right?

26

1    A. That's correct.

2    Q. Okay.  Just --  They got so hot that the gas

3     expanded beyond the pressurized capacity of their

4     containers?

5    A. And they released into the -- into the agent

6     canisters causing the agent to discharge through the

7     distribution system.

8    Q. Okay.  But only partially?

9    A. Apparently based on the quantity of agent that

10     was remaining in the -- the containers after the loss.

11    Q. Okay.  Now once the ten-ounce bottles, the seal

12     on those rupture and that gas goes down into the canisters

13     that hold the dry chemical, just based on that event and

14     aren't the -- isn't the powder in the canisters supposed to

15     completely discharge or nearly completely discharge?

16    A. If it was a complete intended release of the

17     nitrogen gas from the cartridges, yes.

18    Q. Okay.  What would have caused it not to be

19     complete from the nitrogen bottle, the ten-ounce?

20    A. Well it -- it would be a rate.  If -- if the rate

21     of discharge from the nitrogen cylinder was less than

22     needed to drive the agent through the openings in the

23     distribution -- distribution system you could get some

24     residual agent in the -- in the canister.

25    Q. Okay.

26

```
 1    A. You could also get that to occur if the agent in

 2       the canister was not -- was not properly or was already

 3       caked prior to the operation of the system.  There's a

 4       number of reasons why that may have occurred.

 5    Q. Okay.  And in -- in terms of the partial or the

 6       rate issue that you talked about the -- the nitrogen going

 7       from the one-ounce bottle is supposed to go and drive a pin

 8       into the ten-ounce bottles, right?

 9    A. That's correct.

10    Q. Okay.  And -- and I guess that's engineered so

11       that that pin creates a certain size hole, is that right,

12       so that the rate would be relatively fixed?

13    A. Yes.

14    Q. Okay.  Well --

15    A. I -- I don't want to speak to the -- to the

16       engineering of the actual component but -- but the rate of

17       discharge of the nitrogen from the cartridge should be

18       sufficient to drive the contents of the extinguisher within

19       the prescribed discharge time and to overcome the friction

20       loss and head loss of the pre-engineered piping systems

21       connected to it.

22    Q. All right.  And that's -- that's -- that's when

23       the pin breaks the seal as designed on the ten-ounce

24       bottles, right?

25    A. That's correct.

26
```


PDF
Complete
Click Here & Upgrade
Expanded Features
Unlimited Pages

1    Q. And what happens when those seals burst because

2     of heat-related issues, fire gets hot enough to make

3     them burst?

4    A. It -- it could occur at a different rate.

5    Q. Okay.  Because this -- because it's the seal down

6     at the other end breaking at whatever pressure -- whatever

7     rate the pressure within the canister causes, right?

8    A. That's correct.

9    Q. Okay.  So that somebody standing on the outside

10    looking in as this fire is raging around the machine can

11    see a cloud of white powder go out that had nothing to do

12    with a true activation of the system?

13   A. Their perception would be -- would be an

14    activation of the system --

15   Q. Understood.

16   A. -- and -- and it may have a beneficial impact

17    depending on the state of the fire and the quantity of

18    agent discharged.

19   Q. But it's obvious that -- that -- well not

20    nearly -- not even close to all of the agent was

21    discharged, right?

22   A. Correct.

23   Q. Okay.  So what they saw was more likely a result

24    of a heat caused release of the nitrogen from the ten-ounce

25    bottles, right?

26



1   A. That's a possibility.  As I testified to it could

2    also be another reason why the agent didn't completely

3    discharge from the -- from the canisters.  Certainly that's

4    one possibility but I don't think that it's necessarily

5    the -- the only possible cause for that to occur.

6   Q. Well, for instance, you don't think that --  Do

7    you think that the one-ounce bottle had already been

8    discharged prior to the fire based upon the facts you've

9    gathered?

10  A. I -- I don't have an opinion as to the specific

11   cause of the system failure as I indicated in my report.

12   There's not enough information to make that determination.

13  Q. And when you examined the firing mechanism that

14   you looked at I guess that didn't give you any information

15   to use that would help you in deriving a causation issue?

16  A. Nothing definitive, no, sir.

17  Q. Okay.  Ideas?  Nothing definitive but maybe some

18   ideas?

19  A. Well certainly one of the areas of -- of interest

20   based on Mr. Hershberger's interview and subsequent

21   testimony was whether there was some issue with the firing

22   mechanisms installed in the cab through its ability to

23   puncture the cartridge and I found no reason why it

24   wouldn't have.  There -- there are some indications

25   of -- of bent pin problems with one-ounce canisters in

26



1    certain vintage AFEX systems but the -- the pin I observed

2    was straight and unbent and I found no reason to -- why it

3    wouldn't have functioned and punctured the cartridge as

4    intended.

5    Q. Okay.  Now with a machine -- when he --  When

6    Hershberger depressed the plunger the first time, did he

7    tell you whether the motor was still running?

8    A. I believe he testified that it was not running.

9    And I believe he told --  Let me check my notes.

10   Q. Sure.

11   A. (Witness reviews document.)  That was an area

12   obviously of interest.  My notes indicate he shut the

13   machine down prior to pulling the pin and operating the

14   plunger.

15   Q. Okay.  You had indicated, I think you did,

16   that -- that you --  Did you say you -- you wanted to look

17   at the control panel of where there were warning lights in

18   the cab?

19   A. No, I never testified to that.  I testified that

20   I have from Mr. Martin a diagram from the Caterpillar

21   manual of the -- the warning lights associated with it.

22   Q. That's right.  You got a page from the manual

23   about that, right?

24   A. Correct.

25   Q. And you got that in November or did you get

26



```
1      it later?

2      A. Correct.

3      Q. November '05?

4      A. Correct.

5      Q. Why did you get it?

6      A. I believe it was in conjunction with Mr. Tijerina

7       as to what alarms may have been going off that Mr.

8       Hershberger heard prior to him shutting down the machine.

9      Q. Did Mr. --  When you interviewed Mr. Hershberger

10      did he ever tell you that he saw a warning light go on but

11      he -- that he was unfamiliar with?

12     A. No, he did not tell me that.

13     Q. Did you read in Mr. --  Have you read

14      Mr. Tijerina's report?

15     A. Briefly this morning.

16     Q. Okay.  And is it your understanding that

17      Mr. Tijerina also interviewed Mr. Hershberger?

18     A. I believe that's true.

19     Q. Okay.  And did you see where Mr. Hershberger told

20      Mr. Tijerina that -- that an unfamiliar warning light had

21       gone off in the cab?

22     A. I don't remember that in Mr. Tijerina's report.

23      It may be there.  I just read it quickly this morning.

24     Q. Do you --  Did -- did Mr. Hershberger tell you

25       when and why he first radioed back to the shop about any

26
```

1      problems he was having with the machine?

2    A. Yes.

3    Q. What did he tell you?

4    A. According to my notes he said when he got in the

5      cab there was a periodic and intermittent warning light and

6      buzzer sounding that was related to the hydraulic system.

7      He identified light, location, and symbol.

8    Q. Okay.  So through what he told you was

9      there -- there was a warning light but it wasn't

10     unfamiliar, it was a familiar -- he knew what it was?

11   A. I just related to you what he told me in

12     my notes.

13   Q. Is that what you take from what was in your

14     notes, that a warning light was on and a buzzer was

15     sounding and he knew what they meant?

16   A. Let me check my handwritten notes --

17   Q. Okay.

18   A. -- to be sure.

19   Q. You were the one who talked to him.  I'm

20     trying --

21   A. I understand.

22   Q. -- to get your impression when you were there.

23   A. (Witness reviews document.)  I guess it's in

24     here.  Have the question again, please?

25   Q. Sure.  Let me paraphrase.  Did Mr. Hershberger

26

Click Here & Upgrade
Expanded Features
Unlimited Pages
PDF
Complete

1    tell you that as he was getting back into the cab he saw a

2    warning light and heard a buzzer?

3    A. Yes.

4    Q. All right.  And did he tell you he knew what

5    those were, that they had to do with the hydraulic system?

6    A. Yes.  He identified the location of the light on

7    the control panel using -- in words and I related that back

8    to the diagram provided to me earlier by Mr. Martin.

9    Q. And which --  And to a specific light or warning

10    light on the diagram?  Were you able to narrow it down to

11    one button or one light?

12    A. My notes indicate which light it was.

13    Q. All right.  Which one was that?

14    A. He indicated that the light was the second row,

15    second from the left he indicated was associated with the

16    hydraulic system.

17    Q. And that's the -- the bottom row, right?

18    A. Correct.

19    Q. And --  Okay.  And -- and is that what the manual

20    says it is is for the hydraulic system?

21    A. I'm doing this just now because it wasn't the

22    focus of what I was doing.

23    Q. Are you missing a page?

24    A. No, sir.

25    Q. Okay.

26


Click Here & Upgrade
Expand Your Features
Unlimited Pages
PDF
Complete

1   A. You know at least one other control panel was on

2    the diagram Mr. Martin provided to me, the second row,

3    second light is a hydraulic light.  Another one is

4    associated with transmission oil --

5   Q. Okay.

6   A. -- but at least on one of the panel diagrams on

7    sheet 23 of the manual provided by Mr. Martin it is

8    hydraulic light.

9   Q. Are -- are any of the others on either the top

10   row or the bottom row besides that one related to

11   hydraulic?

12  A. On some of the diagrams in this sheet it's the

13   first light on the bottom row.

14  Q. That pertains to hydraulic?

15  A. Correct.

16  Q. And on some of the diagrams in this sheet then

17   what is the second light on the bottom row if it's not

18   hydraulic?

19  A. It is hydraulic.

20  Q. Oh I thought you said it was the first one on

21   some diagrams?

22  A. It is.  We obviously are confused.

23  Q. Yes.  I --  Okay.  Who told you that the warning

24   light that went -- or was on was the one on the second row,

25   the bottom row, two over from the left?  Was that Martin or

26

1    Hershberger?

2    A. Mr. Hershberger --

3    Q. Okay.

4    A. -- during my interview on March 3rd, 2006.

5    Q. Okay.  And then you -- you got -- you got

6    together with Mr. Martin and you got a diagram of the

7    system, right?

8    A. Correct.  And I don't recall if it was before or

9    after.  I -- I wanted -- I think I testified earlier I

10    believe I got that in November.

11    Q. Okay.  And -- and -- I'm sorry.  Dates are not

12    important to me.  You -- you have a -- a sheet with a

13    diagram that explains what each of the lights is, right?

14    A. Correct.

15    Q. On the 826D -- or G?

16    A. Well it was indicated to me that was the case.  I

17    asked for this document and it was provided to me by Mr.

18    Martin.

19    Q. And -- and -- and I guess what I'm confused about

20    is I heard you to say that when you looked --

21    A. It might be simpler if you looked at it.

22    Q. Yeah.  Well I have.  When you looked at this one

23    second over from the bottom that that's hydraulic?

24    A. Not the one you're pointing to, sir, no.

25    Q. This is hydraulic?

26

```
 1    A. Yes, sir.

 2    Q. All right.  But he's got a drawing over there

 3     showing the light that was on was the second one?

 4    A. Correct.

 5    Q. And that's why I was asking you --

 6    A. On this one it is hydraulic.

 7    Q. Ah okay.  And do you know what the difference is

 8     between the two?

 9    A. No.  And I don't know which panel was the

10     exact --

11    Q. I gotcha.

12    A. -- one that was located in the -- in the

13     document.

14    Q. Okay.  And -- and what is -- what is the -- the

15     second one on the other one if it's not hydraulic?

16    A. Transmission oil filter restriction.

17    Q. Did you say that when we first started?

18    A. I did.

19    Q. And I'm sorry.  I didn't hear that part.  That

20     explains the confusion.  Thank you.

21    Okay.  And did you get any pictures while you

22     were out at your inspections at any time of this control

23     panel on the 826G in question?

24    A. I don't recall.  I would have to go through them

25     all to see.

26
```

Click Here & Upgrade
Expanded Features
Unlimited Pages
PDF
Complete

1    Q. Okay.  And --

2    A. I don't recall.

3    Q. And it's still down there, right?

4    A. I have no idea.

5    Q. Okay.  Mr. Hershberger did not tell you when you

6     talked to him that he was unfamiliar with what the light

7     meant, did he?

8    A. I just related to you what Mr. Hershberger told

9     me during my interview.  He identified the light and

10     the -- what he understood the purpose of the light to be.

11    Q. A hydraulic line?

12    A. Hydraulic.

13    Q. And that would be some sort of failure on the

14     hydraulic system?

15    A. Again, I'm -- I'm not an expert on --

16    Q. No, no.  What --

17    A. -- the purposes of these warning lights and what

18     they indicate on a particular machine.

19    Q. I'm not asking you that.  I'm asking --

20    A. If the warning light -- I'm not finished --

21    Q. I'm asking you what Mr. Hershberger conveyed to

22     you.  Did Mr. Hershberger convey to you he understood that

23     light to mean there was a problem with the hydraulic system

24     on the vehicle?

25    A. That it was associated with the hydraulic system,

26

```
1        yes, sir.

2     Q. Okay.  All right.  And then within a relatively

3      short period of time he parked the vehicle, shut down the

4      engine.  But, now, he saw black smoke before he shut down

5      the engine?

6     A. No, sir.

7     Q. Okay.  What -- what was the sequence?

8     A. The sequence indicated in my notes is that when

9      he got in the cab there was a periodic intermittent warning

10      light and buzzer sounding that was related to the hydraulic

11      system.  He radioed Chris Martin who asked him what were

12      the gauges reading and he provided that information to

13      Mr. Martin and that they seemed okay.  Chris told him he

14      would come and check the machine.  I'm just reading my

15      notes at this point.

16     Q. That's fine.

17     A. The machine was stopped and parked but still

18      running.  He was in the machine thereafter for about five

19      minutes idling with no work to do.  Do you want me to

20      continue?

21     Q. Is your impression that during that time period

22      he's waiting on Martin to get there?

23     A. I -- I believe he was waiting to do work and for

24      Mr. Martin to come I suppose.

25     Q. Okay.  And then go ahead.

26
```

1    A. I -- I don't have an independent recollection of

2     what I thought he was waiting to do at the moment.

3    Q. Okay.  Or a note?

4    A. Pardon?

5    Q. Or a note?

6    A. Or a note.

7    Q. Okay.  Go ahead.

8    A. A city of St. Mary's truck pulled up where he was

9     sitting - he indicated Steve was the name of that

10    driver - and proceeded to dump approximately 20 to 30 feet

11    away from his blade.

12    Q. Go ahead.

13    A. He was pre-positioned for the dump.  And as he

14    moved towards the truck he heard a pop and felt a shudder.

15    He noted that his gauge -- gauges still looked okay.

16    Q. All right.  Now right there, did you stop to ask

17    him whether this intermittent hydraulic thing was still

18    going on?  Hydraulic alarm?

19    A. Not as indicated in my lights -- in my notes.

20    This is just what he -- he shared.

21    Q. Okay.  So you --

22    A. But he did indicate that the --  When he moved

23    towards the truck he indicate -- he noted that his gauges

24    still looked okay.

25    Q. Okay.  All right.  Did -- did Mr. Hershberger

26

Click Here & Upgrade
Expanded Features
Unlimited Pages
PDF
Complete

1    ever tell you that in fact he never radioed Chris until

2    after he had tried to depress the plunger but the plunger

3    didn't work?  That's not what he told you, right?

4    A. I believe he subsequently called Chris later.

5    Q. Right.

6    A. I don't remember any -- his deposition as to

7    whether he was -- he was inquired -- whether he was asked

8    as to an earlier radio traffic with Chris or not.  I

9    don't recall.

10   Q. Okay.  All right.  Are there any other --

11   A. I -- I believe you were asking me questions as to

12   whether or not he saw the smoke or flame prior to him

13   pushing the plunger was the question I was answering as I

14   read this.

15   Q. Yes.  We didn't get there yet, did we?

16   A. No.

17   Q. Okay.  Go ahead.

18   A. As he was pre-positioning for the dump that's

19   when he looked over his right shoulder and saw what he

20   described as a heat plume similar to what he had seen back

21   in April.  He indicated it was the same location but

22   somewhat larger but he saw no smoke or flame.

23   Q. Okay.

24   A. So that -- that answers the question as to

25   whether he saw smoke or flame prior to when he depressed

26

1    the plunger.  He had not depressed the plunger when he

2    noticed the heat plume.

3    Q. All right.  And then as you keep going he turns

4    off the motor before he depresses the plunger?

5    A. He indicated he backed the machine up slightly to

6    get away from the St. Mary's truck.  He looked over his

7    shoulder to confirm the heat plume.  This time he saw some

8    smoke.  He then shut the machine down, pulled the pin and

9    punched the plunger.

10   Q. All right.  In terms of the October 4, 2005

11   inspection not being in compliance with the AFEX technical

12   manual, what was done -- what did they do that would have

13   prevented any other expert coming in from determining, if

14   that were possible, why the fire suppression system didn't

15   work?

16   A. They materially changed the condition of the

17   system as they found it without adequately documenting the

18   circumstances and -- and the conditions that they found in

19   my judgment.

20   Q. Okay.  And -- and I understand that's --

21   A. I -- I --  Because I don't know the

22   specific -- can't determine specifically what it was that

23   caused it not to function, I can't therefore say what it is

24   they did or failed to do that prevented it from doing so.

25   Q. And I guess that's what I'm trying to get my

26

1    hands on.  I mean so once you realize that guys unscrew a

2    bottle, pull the plug out, and then a -- a pin gets bent,

3    does everybody just throw up their hands and say, well,

4    then there's no use in even going further with this because

5    we can't figure out what caused this thing to not

6    discharge; is that accurate?

7    A. No, that's not accurate.

8    Q. Okay.  Well so that's what I'm asking for.  I

9    mean what -- what prevented people from, all right, well,

10   that happened, now let's look at what's going on?  What is

11   there?

12   A. Not knowing in totally what was done it's hard to

13   answer that question.

14   Q. Okay.  For example, the pins, one was bent and

15   you have a picture of it, right?

16   A. Correct.

17   Q. Mr. Tijerina told you that that connector, that

18   harness, had been firmly plugged into its port, right, in

19   September?

20   A. I believe --  Yes, I believe he has photographs

21   about that --

22   Q. Okay.

23   A. -- showing that.

24   Q. That connection could not have been firmly and

25   completely made with the pin bent, right?

26

1    A. I believe that's true.

2    Q. Okay.  Which means that as -- as of September 8,

3    2005, the pin wasn't bent and the pin therefore had nothing

4    to do with why the fire suppression system didn't work,

5    right?

6    A. It's likely the pin was not bent when

7    Mr. Tijerina saw it plugged into the squib -- squib harness

8    plugged in in September, correct.

9    Q. Okay.  And so if it was completely plugged in

10   then the -- the fact that it was bent later doesn't have

11   anything to do with what -- what caused the fire

12   suppression system not to discharge, right?

13   A. That's likely true.

14   Q. Okay.  Now I guess are you assuming to be true

15   that, for example, these -- these hoses, like the hose

16   around this canister here (indicating) and -- well your

17   versions --  You have three color photos of what's

18   essentially the same area that's depicted in Defendants' 1

19   and 2 of Tijerina deposition.  You're --  Are you assuming

20   that Chris Martin's testimony is the truth that that line

21   was cut with a knife just because Mr. Martin says he saw

22   that happen?

23   MR. MILLER:  Object to the form of the question

24   but go ahead.

25   \

26

```
1      BY THE WITNESS:   (Resuming)

2   A. No, I'm not.

3   Q. Okay.

4   A. And I told you I didn't have any analysis as to

5      how that -- or what tool may have been used to -- to -- to

6      cause that break in that line.

7   Q. What if we learned that in fact that the hose

8      depicted in -- in your three photos and Defendants' 1 and 2

9      was not fractured on September 8th as depicted in

10     Mr. Tijerina's photos, that it -- it was intact, how does

11     that make it impossible you -- for you to figure out what

12     caused the fire suppression system not to discharge?

13  A. I didn't say it wasn't possible.  It says --  I

14     indicated it hampered it.

15  Q. Okay.

16  A. I don't believe it would make it impossible.

17  Q. All right.  Well let's say we know that now.  I

18     mean here's a picture showing it's intact and now we have

19     it broken later.  Okay.  So we know that.  So at

20     the --  You know, September 8th, the hose is intact.

21     How -- how are you hampered now with -- with knowing that?

22     How are you hampered in determining whether that hose had

23     anything to do with the cause of the fire suppression

24     system failing?

25  A. Based on the information I had now or have, I

26
```

Click Here & Upgrade
Expanded Features
Unlimited Pages

1     don't think I can say to a reasonable degree of certainty

2     whether that that hose had anything to do with the failure

3     of the system, its condition.

4     Q. All right.   Can't say one way or the other?

5     A. I can't say.

6     Q. Okay.   All right.   And -- and are you saying that

7     had you -- had the hose looked like this as depicted in

8     Defendants' Exhibit Number 1 on November 11 when you went

9     and looked at the machine that you would have been in any

10    other position to say otherwise?

11    A. No, I can't say that.

12    Q. Okay.   This hose that's depicted in -- that's the

13    copy date -- this is a picture and it says --  Let me see

14    if these all have that on there though.

15    A. Yeah.   The bracket number.

16    Q. Okay.   Yeah.   Number 35, is that what -- is that

17    what that says to you, 35?

18    A. Correct.

19    Q. Okay.   And that's -- that's in real faint print

20    on the back of the photograph.   These were reprinted on

21    March 20th, 2008.   There's a -- there's a picture of the

22    fractured hose, okay.   Now you go through your --  Why did

23    you take that picture?

24    A. Because it was a fractured hose that he observed

25    during -- during that inspection.

26

1    Q. Okay.

2    A. And -- and, again, I don't know when that

3    fracture would have occurred.  I don't know if it occurred

4    in October, if it occurred -- if it was broken at the top

5    of the hill or if it was broken during being transported

6    from the top of the hill down.

7    Q. Okay.

8    A. But the opportunity to -- to obtain that

9    information existed on October 4th when the machine was

10   inspected at the top of the hill.

11   Q. Is it your belief that the machine on October 4,

12   2005 had not been moved yet from where it was at the time

13   of the fire?

14   A. No.  I believe it had been -- had been moved I

15   believe if I recall a couple hundred feet in order to

16   accommodate ongoing activities at the -- at the landfill.

17   Q. So it was dragged back by the D7 is what they

18   testified to, the dozer, the bulldozer, right?

19   A. I believe that's true.

20   Q. And -- and that would be giving that machine some

21   jolting, wouldn't it?

22   A. I suspect it would, sure.

23   Q. And so if you have some brittle lines that hose

24   could have fractured in that movement, right?

25   A. As I just testified to I don't know when that

26

1    would have occurred.

2    Q. Okay.  And you have nothing to indicate that Mr.

3     Smith or Mr. Latham did that to that hose on October 4,

4     2005?

5    A. That particular hose in photograph --

6    Q. 35.

7    A. -- 35, that's correct.

8    Q. Okay.  Okay.  And the -- the picture of the

9     bracket bolt that was loose in your two pictures, do you

10    have any -- anything -- any reason to believe that

11    Mr. Latham or Mr. Smith did that, that is, that they

12    encountered the tanks with that bracket in a tight position

13    and left them in a loose position?

14   A. No specific testimony is -- is that only --  No

15    specific testimony as to that, no.

16   Q. I mean Mr. Martin didn't even reference this

17    bracket in his deposition, did he?

18   A. That's correct.

19   Q. Okay.

20   A. Mr. Martin wasn't -- testified he wasn't with

21    them at all times during all of their inspections.

22   Q. All right.

23   A. It was an observation that I photographed based

24    on my -- my looking at the machine and the system.

25   Q. And that's all it is at this point.  It's just

26

1     you saw a bracket that was not loose -- or -- or not tight

2     and you photographed it, right?

3     A. That's correct.

4     Q. You have no idea when that became loose?

5     A. That's correct.

6     Q. Okay.

7     A. But I wouldn't have expected it to be loose which

8      is why I took a photograph of it.

9     Q. Okay.  And then you've got these pictures of the

10     harness being not connected.  Of course, now Mr. Smith you

11     understand testified that that might have been his error

12     and that he might not have put the harness back on, right?

13    A. I don't recall that testimony.  I recall he said

14     that he did put it back on, reconnected everything and had

15     put on and taken them off for thousands of times.  Maybe

16     I'm mistaken though.

17    Q. All right.  And then there's -- there's pictures

18     of what you said you believe to be the wiring coming from

19     the harness on the squib and the hose that goes to the

20     actuators coming from what might be the cab, right?

21    A. Correct.

22    Q. Do you have any evidence to indicate that

23     that -- those fractures were done by Mr. Smith or

24     Mr. Latham?

25    A. No.  That location was not cited by -- by

26

1     Mr. Martin in his -- in his testimony as to where he

2     observed the hose being cut as he described it.

3     Q. Okay.  So the only pictures you have in that

4     regard are -- are the ones of the top of the canister

5     because they're just in the area of the canister and that's

6     what Mr. Martin testified to?

7     A. That's correct.

8     Q. And you don't --

9     A. That -- that was a source of these -- these

10    photographs that you asked me to pull them out.

11    Q. And as you -- And as you've said, you -- you

12    don't know whether Mr. Smith or Mr. Latham did that or not?

13    A. It -- it's -- it's consistent with Mr. Martin's

14    observations.  And -- and --  But, yes, that's -- that's

15    true.

16    Q. When you -- you said you opened the canisters

17    when you --  You didn't remember whether it was November

18    or -- or March.  Did you cut any hoses to do that?

19    A. I don't believe so.

20    Q. Okay.  Would you have had to?  Would you have had

21    to cut hoses to open a canister?

22    A. No, sir.

23    Q. Okay.  I mean they screw off, right?

24    A. Correct.  The tops screw off.

25    Q. Okay.  Did you --  Would you need any tools to

26

1    unscrew them?

2    A. You may need some help.

3    Q. And the --  But essentially they're designed to

4    unscrew like the lid on a mayonnaise jar, right?

5    A. They're probably a little tighter than

6    the -- than a lid on a mayonnaise jar but -- but they're a

7    screwed lid into a pressurized container.

8    Q. Is this the lid we're talking about with

9    the -- with the line that runs through it with the

10   indention on the top?

11   A. On Exhibit 1, yes.

12   Q. Okay.  Defendants' Exhibit 1.  All right.

13   And -- and that groove is there to stick a tool in to maybe

14   help pry it open if you need to?

15   A. A little helper --  Yeah.  Put a little helper on

16   there to get some torque on that cap.

17   Q. Okay.  Did you use a tool to open the canisters?

18   A. I don't recall.

19   Q. Okay.  Did you bring your toolbox?

20   A. I believe Mr. Tijerina brought his truck and it

21   had tools in it.

22   Q. Okay.  Did you read what Mr. Martin said that

23   Mr. Latham and Mr. Smith came in October and they didn't

24   have tools with them and that's why they cut hoses?

25   A. I believe I recall some discussion about tools in

26

1      his deposition, yes.

2      Q. Do you believe that?

3      A. I didn't judge belief or unbelief in that

4       comment.  I just noted it.

5      Q. Okay.  Did you take tools with you in November?

6      A. No.  I flew in and it's more and more difficult

7       to take tools on -- on aircraft.

8      Q. Okay.

9      A. I believe Mr. Smith flew as well.

10     Q. And in March did you fly in then?

11     A. I did.

12     Q. Okay.  But you knew Mr. Tijerina was coming

13      by car?

14     A. Correct.

15     Q. Okay.  Had you prearranged that he would bring

16      tools?

17     A. I believe we had discussed that.  I -- I don't

18      recall specifically.

19     Q. Did he bring tools in November?

20     A. I believe he had some tools in his vehicle

21      and -- and certainly there's Mr. Martin would have had

22      tools available on site at -- at the -- at the landfill but

23      I don't recall specifically.

24     Q. Okay.  Are you aware of any other compromises in

25      the hoses, pressurized hoses, besides those that are

26

1    depicted in all the photographs on the table?

2    A. No.

3    Q. Are you -- are you aware of any fractures or cuts

4     or compromise of any wires to the fire suppression system

5     other than what's on the table?

6    A. Not specifically, no.  Other than those -- those

7     that were testified in -- in certain depositions.

8    Q. And let me rephrase that because there's a

9     boatload of stuff on this table.  I'm talk -- I'm talking

10    about what's depicted in the ten photos that you brought

11    and the two photos that Mr. Tijerina brought.  Are you

12    aware of any wires that were compromised, cut, or nicked

13    that you saw that are not depicted in any of those twelve

14    photographs?

15   A. (Witness reviews photographs).  I remember

16    photographing the connection of the system to the battery

17    and I -- I'm just looking to see if that shows a -- a cut

18    at that location.

19   Q. Would you have looked there because of Mr.

20    Martin's testimony?  Obviously not because you didn't have

21    that at the time, right?

22   A. Correct.

23   Q. Okay.

24   A. Obviously not.  The answer to your question

25    is no.

26

PDF
Complete

Click Here & Upgrade
Expanded Features
Unlimited Pages

1    Q. Okay.  You have a picture of wires going into the

2     battery there, don't you?

3    A. I do.

4    Q. None of them are cut, are they?

5    A. Well I -- I --  The purpose of the photograph

6     wasn't to discern whether any wires were cut or not.  It

7     was just to look at the -- to document the location of the

8     connection.

9    Q. I understand.  And I'm not --

10   A. And I can't discern whether they -- they're cut

11    or not in this photograph.

12   Q. Okay.  Well but you were there, right, looking at

13    what you just --  I mean that's just a photograph.  You

14    were actually there looking at it, right, for longer than a

15    split second the frames of that camera went open or the

16    shutters went open, right?

17   A. Certainly.

18   Q. Okay.  Did you see any broken wires --

19   A. I made no note of a broken wire.

20   Q. But what --  Isn't it likely you would have?

21   A. If I observed it.

22   Q. Yes?

23   A. Yes, if I observed it.

24   Q. Okay.  In fact, if you had noted breaks in hoses

25    or wires that you thought were pertinent to the operation

26

1    of the fire suppression system, you would have taken

2    pictures of them, right?

3    A. Well, again, with regard to the wires the

4    important aspect of the investigation even then was why the

5    system did not operate manually when operated by

6    Mr. Hershberger --

7    Q. Right.

8    A. -- because presumably based on information that

9    was available it -- he would have -- he attempted to

10   discharge the system prior to any automatic -- prior to

11   the -- likely prior to the automatic discharge of the

12   system from a fire.

13   Q. Okay.  Was there any consideration back as early

14   as the November '05 March '06 time frame that the system

15   could have discharged electrically but owing to a

16   compromise in the hose none of the powder would have been

17   dispersed?

18   A. Repeat that again, please?

19   Q. Sure.  Was there any thought or consideration in

20   the November '05 to March '06 time frame that electrically

21   the system could have discharged, that is, a sensor went

22   off and the one-ounce nitrogen bottle fired but none of the

23   powder was dispersed because of a compromise of the hose

24   going from the one-ounce bottle to the ten-ounce bottles?

25   A. In November, no, because the belief and

26

1    information available was the system may have automatically

2    activated subsequent to Mr. Hershberger attempting to

3    discharge it manually.

4    Q. Okay.  In March when you were there inspecting

5    the machine, was there any understanding what was going to

6    happen to the machine after your inspection?

7    A. Not any personal knowledge.  I assumed it would

8    be --  I made an assumption as to what would be -- No, I

9    didn't have any personal knowledge as to what would be

10   happening with the machine after March.

11   Q. Are they typically sold to salvage?

12   A. I would expect that could be possible.  I don't

13   know.

14   Q. You had your camera there though with you in

15   March, right?

16   A. I suspect that I did.

17   Q. Okay.  You said something about the airlines.  I

18   mean you -- you can check tools, can't you?

19   A. Sure.

20   Q. You're not going to drag it through security,

21   right?

22   A. That's correct.

23   Q. Okay.  Is there any reason why, for

24   example -- one thing I don't see in anybody's photographs

25   really is --  Show me a picture of the hose from the

26

```
 1    one-ounce nitrogen bottle going all the way to the

 2    ten-ounce bottle.  I want to see every inch of the length

 3    from A to B.  And what I see is I see a picture up here and

 4    maybe there's an inadvertent one here because somebody was

 5    aiming the camera at this point over here.  But it doesn't

 6    appear that anybody attempted to take a sequence of

 7    pictures showing the whole length of the hose.  Do you

 8    agree with that?

 9    A. No.

10    Q. Okay.  You think there is an attempt to document

11    the whole length of the hose?

12    A. Yes.

13    Q. Where is that?

14    A. (Witness reviews photographs.)

15    Q. And pardon me because I haven't even seen all of

16    your pictures yet so...

17    A. Perhaps there is I should say.  I believe these

18    photographs show a large portion.  It's not that complete

19    run of tubing --

20    Q. Okay.

21    A. -- or hose I should say.

22    Q. Well as you took those pictures was it your

23    intent to record or memorialize the whole run?

24    A. My intent --  It may well have been.  I -- I

25    wouldn't be surprised if I was intending to photograph

26
```

Click Here & Upgrade
Expanded Features
Unlimited Pages
PDF
Complete

1      that -- that run of tubing.

2      Q. Okay.  Physically since everybody was allowed to

3       do perhaps if not destructive testing you were allowed to

4       open and touch things on March the 3rd, 2006 as I

5       understand your testimony, right?

6      A. I believe so.

7      Q. Okay.  And these -- were you sure whether these

8       were -- was that --  Were those pictures in front of you

9       taken in November?

10     A. I believe so.

11     Q. Okay.  So those are November.  In March did you

12      actually eyeball and follow with your fingers all the way

13      down or try to look at every angle of the hose from

14      squib -- at squib connection to ten-ounce canisters -- or

15      ten-ounce bottles of nitrogen?

16     A. I documented photographs based on the -- you

17      know, what you see here.  I don't remember specifically

18      touching and feeling every inch of that hose from the squib

19      connector with the operator to the -- to the ten-ounce

20      canisters.

21     Q. Are you confident that every compromise in that

22      hose is -- is recorded in your photographs?

23     A. No.

24     Q. Okay.

25     A. Because it's been subjected to fire and there may

26



```
1        be compromises you can't visually see in photographs.

2        There can be breaks and opens and -- and other opens

3        post-fire that have occurred because of the embrittlement

4        of the hose.

5    Q. But if you had seen any --  Aside from what the

6        photographs now show, if you had seen any in your visual

7        inspection of the line you would have attempted to isolate

8        any fracture or -- or severed portion of the hose?

9    A. If I thought it was important, sure.

10   Q. Okay.  Would there have been those in that

11       particular hose that would not have been important?

12   A. That's an important hose.

13   Q. Okay.

14   A. It provides the control pressure to the nitrogen

15       canisters associated with the extinguishing containers.

16   Q. All right.  Have you been asked to undertake any

17       other work than you've told me about -- well than you've

18       done already?

19   A. No, sir.

20   Q. All right.  No more issues to look into?

21   A. That's correct.

22   Q. Okay.  In terms of where you encountered the hose

23       you've got some pictures of where it comes out of the cab,

24       where they run.  Was all of that in keeping with what the

25       installation manual issued by AFEX required?

26
```

1    A. I didn't do a discrete analysis of whether the

2     routing and material and the lengths of the hose -- of any

3     hoses were consistent with the AFEX manual.

4    Q. Are there pinch points on the machines?

5    A. Sure.

6    Q. Okay.  And they can cause mechanical fractures of

7     hoses and wires if people put the hoses and wires in bad

8     places?

9    A. I would expect that's the case.

10    Q. Okay.  Based upon Mr. Hershberger's testimony

11     that when he -- when he depressed the plunger it bottomed

12     out, it didn't feel like the last time, there was no

13     resistance, does that indicate to you one way or the other

14     whether that one-ounce nitrogen bottle had already -- the

15     gas within it had already been released before he ever went

16     to depress the plunger?

17    A. That's one possibility.

18    Q. Okay.  What's another?

19    A. That there was no gas in the container to

20     begin with.

21    Q. Okay.  Any others?

22    A. In November of '05 a possibility would have been

23     that the -- there was a problem with the actuator itself.

24    Q. And then how --

25    A. But my subsequent inspection of the actuator did

26

1       not discover any problem with it.

2    Q. Okay.  If every fracture or severed wire hose

3       that's in any of these pictures we've been talking about

4       didn't exist on the day of the fire, every hose, every wire

5       was intact, what caused the fire suppression system not to

6       function under that hypothetical?

7    A. I don't know.

8    Q. Okay.  What would you need to know?  I mean what

9       else would you need to know that you've been deprived of

10      having to be able to formulate what caused the fire

11      suppression system not to work if all of those hoses and

12      wires were intact?

13   A. The conditions of the fire protection system just

14      prior to it being called on to actuate, such as the

15      condition of agent within the -- within the canister, the

16      weight and proper installation of components including

17      actuation and discharge cartridges I call them, the

18      integrity of the agent containers.  By containment, I'm

19      talking about its protection from moisture including seals

20      would be examples of the -- of the -- of the things you

21      would be looking for.

22   Q. And that -- if -- if I --  You correct me if I'm

23      wrong but what I heard you say was those are things you

24      would have liked to have known what they were like before

25      the fire?

26

1    A. Correct.

2    Q. All right.  How would --  How was your ability to

3     inspect the machine after the fire, how did that prevent

4     you from determining or answering any of those questions?

5    A. The changes to the equipment caused by the fire

6     and by subsequent disturbing of the equipment.

7    Q. And when we look at subsequent disturbing of the

8     equipment, what in particular?

9    A. Well we've gone through the inspection on October

10     4th and it -- it -- that work not being done consistent

11     with AFEX recommendations for documenting the scene.

12   Q. I mean I realize that something can be done

13     without being done in accordance with rules and

14     regulations.  But what I'm really more interested in is

15     what they actually did that prevented you from determining

16     the integrity of the system.  So, for example, if some guy

17     unscrews the lid and looks in and sees caked up powder and

18     puts the lid back on, how does that prevent you from doing

19     the same thing?

20   A. That example doesn't --

21   Q. Okay.

22   A. -- because I don't know -- I'm not able to

23     determine what specific cause for the system failure

24     to -- the system's failure to discharge was.  I can't

25     answer that question with any specificity.

26

1    Q. Okay.  Now we've already been through the pins

2     not being a likely cause of anything.  The hose:  You've

3     already indicated you really couldn't say one way or the

4     other whether if that hose on the canister was intact, that

5     would have had anything to do with the fire suppression

6     system working or not, right?

7    A. I don't think I was asked that question.

8    Q. Well, in other words, --

9    A. If that -- if that hose --

10   Q. If after the fire you learned that this hose as

11    depicted in 1 was just like -- it was intact as opposed to

12    how it's depicted as fractured in your pictures that

13    doesn't really tell you how the fire suppression system

14    failed?

15   A. That's correct.

16   Q. Okay.

17   A. I misunderstood the question.

18   Q. So I mean, again, I -- I appreciate that you

19    contend these guys went in there and didn't do things

20    according to Hoyle.  They didn't follow AFEX's own

21    technical manual.  But what specifically did they do that

22    prevented you from determining what caused the fire

23    suppression system not to work?

24   A. I cannot cite a specific instance of what they

25    did because I don't know everything that they did do so I

26

Click Here & Upgrade
PDF
Complete
Expanded Features
Unlimited Pages
Documents

```
1    can't -- -- I -- I don't know.  I cannot cite a specific

2    activity that -- that prevented me from determining that.

3    And I didn't -- I didn't offer that opinion.

4    Q. I mean one of the -- one of the allegations

5    obviously in this case since nobody has an opinion of what

6    happened is -- is -- is that you're prevented from offering

7    opinions as to what happened because somebody messed with

8    the system.  Well that either carries weight or it doesn't

9    based on, well, what about what they did prevented you from

10   doing your job.  And what you're telling me today is you

11   don't know?

12   A. That's correct.

13   Q. Okay.  And we've gone through certain particulars

14   about, for example, the lid on the fire canister, the hose

15   coming out of the canister, the harness connection that

16   would not have had anything to do with your ability to tell

17   what caused the failure of the fire suppression system,

18   right?

19   A. That's correct.

20   Q. Okay.  If I told you that, for instance, in this

21   picture of this canister where that hose is severed that it

22   was done accidentally on October 4, 2005 so that you now

23   know that that hose was as it was depicted on September

24   8th, it was intact.  Again, that would -- that would not

25   help you in determining what caused the fire suppression

26
```

Click Here & Upgrade
Expanded Features
Unlimited Pages
PDF
Complete

1     system to fail, right?

2     A. That's correct.

3     Q. And if you learned that --  Where are those

4      pictures of these and the -- and the ones where the wire

5      and the hose come out of the cab.  If you had learned that

6      at the time of the fire that hose coming out of the cab was

7      not severed but it was -- it was intact, would that help

8      you determine what caused the fire suppression system

9      to -- to fail?

10    A. That would be useful information if that hose was

11     completely intact and functioning from the one-ounce

12     canister to the ten-ounce.  That would be useful

13     information.

14    Q. Tell me -- tell me why?

15    A. Because the pressure boundary providing gas from

16     the actuator to the -- to the containers would be intact.

17    Q. Assuming it wasn't compromised at some other

18     portion along its length, right?

19    A. Correct.

20    Q. Okay.

21    A. That was the premise of your question.

22    Q. All right.  Let me see; any of these other

23     things --  This hose that's down in the engine where we're

24     not sure if that's the head cover above it or not near a

25     shaft, if you were to learn that pipe -- or that hose was

26

1    intact at the time of the fire, would that help you at all

2    in determining why the fire suppression system failed?

3    A. No.

4    Q. And just to sum it up and you said it and I

5    apologize but you don't know what Mr. Smith did or didn't

6    do or Mr. Latham did or didn't do on October 4, 2005

7    specifically that prevents you from determining why the

8    fire suppression system didn't work?

9    A. That's correct.

10   Q. Okay.

11   MR. ALLRED:  Thank you.

12   THE WITNESS:  You're welcome.

13   MR. ALLRED:  She probably has some questions.

14   MS. AKINS:  I don't have very many.

15                        CROSS-EXAMINATION

16    BY MS. AKINS:

17   Q. Mr. Arnold, did you ever talk to Mr. Murray, the

18    fellow that owned Integrated?

19   A. No, ma'am.

20   Q. Okay.  What about to his stepson, Austin

21    Latham, --

22   A. No, ma'am.

23   Q. -- did you talk to him?

24   A. No, ma'am.

25   Q. Mr. Allred asked you some questions about the

26

Click Here & Upgrade
Expanded Features
Unlimited Pages

1    items in your report where you criticized Integrated

2    System.  And one of the things that you said is that it's

3    your understanding based on what you've reviewed that

4    Integrated did not properly instruct, I guess, the Camden

5    County employees about the inspection procedures; is that

6    accurate?

7    A. Yes, ma'am.

8    Q. Okay.  And I just want to make sure that

9    this -- that -- that this is clear because I'm not sure

10   that it's what you answered before.  But let -- let's make

11   sure.  You tell me if I'm wrong.  If ITS (sic) had provided

12   the instructions that you believe they should have to the

13   Camden County employees about maintaining and inspecting

14   the trash compactor, how -- how does that affect your

15   opinion, if it does, about why the fire suppression system

16   failed, not what caused the fire but why the fire

17   suppression system failed?

18   A. I don't know why the fire suppression

19   system failed.  I haven't offered an opinion as to a

20   specific cause.

21   Q. So you don't have any opinion as to what effect

22   ITS (sic) not providing any maintenance or inspection

23   information to Camden County had on the failure of the fire

24   suppression system?

25   A. Fire suppression systems should be maintained and

26

Click Here & Upgrade
Expanded Features
Unlimited Pages

PDF
Complete

1    inspected to maintain their -- their functionality.  That's

2    good practice and it's required.

3    Q. Sure.

4    A. And that information should have been made aware

5    to Camden County to maintain the system in a functional

6    state both in terms of their daily inspections as well as

7    regular maintenance and service by -- by a supplier.  The

8    purpose of that -- that work is to prevent impairments that

9    cause the system not to function when -- when called for.

10   So -- so the extent that those inspections may or may

11   not -- may -- were not done and service was not done

12   provide an opportunity for any defect that I can't define

13   to exist that caused the system to fail to operate when

14   called for.

15   Q. So you're not able to tell us what effect, if

16   any, ITS (sic) not providing that information to Camden

17   County had on the failure of the fire suppression system,

18   correct?

19   A. That's correct.  Because they don't know what the

20   specific failure was.

21   Q. When y'all were doing the March '06

22   inspection did Mister - and I can't say his name

23   right - Tijerina -- is that right --

24   A. That's --

25   Q. -- did Mr. Tijerina take anything with him when

26

PDF Complete

Click Here & Upgrade
Expanded Features
Unlimited Pages

1     he left the landfill?

2     A. I believe he took components of the fire

3      suppression system.

4     Q. What components did he take with him?

5     A. Those that were removed from the machine you'll

6      have to get the list from him but I know it included the

7      actuator in the cab, tanks and cylinders and some

8      associated distribution piping I believe.

9     Q. And what's your understanding of who removed

10     those items?

11     A. I believe it was Mr. Tijerina and I may have

12     assisted.  I don't recall specifically.

13     Q. And was that done in March of 2006, the component

14     parts being removed --

15     A. I don't --

16     Q. -- from the compactor?

17     A. I don't remember.  I don't remember.  I don't

18     remember when it was done.

19     Q. Could it have been done before March?

20     A. It could have.

21     Q. Could have been done when y'all were there in

22     November of '05?

23     A. That's possible.

24     Q. What was the reason for removing those parts and

25     taking them with you -- Mr. Tijerina taking them?

26

1    A. I -- I think to protect those parts from any

2      further disruption or -- or -- or decay or -- or

3      other -- other inspections.  I know I -- I wanted to take

4      the manual assembly and protect that because I wanted to

5      inspect that further.

6    Q. Did you do anything with those component parts as

7      part of your work on this case?

8    A. The only thing I did was visually inspect the

9      plunger assembly for bent pins and for its functionality

10     which I did not do in November or March.  I didn't move

11     anything in -- in that time.

12   Q. And when you fiddled with the plunger after March

13     of '06 you convinced or you satisfied yourself that there

14     was no plunger problem due to a bent pin, right?

15   A. That's correct.

16   Q. And -- and just so I'm clear the reason that

17     you've written in your report and it's your opinion that

18     Mister -- that Integrated did not conduct the work that

19     they did on April 26 of '05 in accordance with the

20     maintenance requires -- requirements of NFPA 17 and AFEX

21     2000 Installation and Maintenance Manual and further

22     provide substantive written information to Camden County

23     concerning the inspecting and repair including the

24     maintenance report and recommendations such as the need for

25     owner inspections, regular maintenance, and related

26

1    services and inspection of documentation is because you've

2    seen no documentation that that was done; is that correct?

3    A. That's correct.

4    Q. And that's the sole basis for that opinion?

5    A. That's correct.

6    Q. And you've told me that you never talked to

7     Mr. Murray --

8    A. That's correct.

9    Q. -- to know what he might have -- what he says he

10    might've done?

11   A. That's correct.

12   Q. And you certainly never talked to his stepson

13    either?

14   A. That's correct.

15   Q. Okay.

16   MS. AKINS:   Thank you.

17   THE WITNESS:   You're welcome.

18                          DIRECT EXAMINATION

19    BY MR. MILLER:

20   Q. I just want to make sure I understand.   None of

21    the component parts from this compactor were removed until

22    after the joint inspection, right?

23   MR. ALLRED:   Object to form.

24   MS. AKINS:   Object to form.   Mischaracterizes his

25    testimony.

26

1      BY MR. MILLER:   (Resuming)

2      Q. Do you know the date that the components --

3      A. I --

4      Q. -- were removed?

5      A. Not specifically in my mind right now just here

6       today.  I would -- I would defer to Tony and notes.

7      Q. Do you know whether that was after the joint

8       inspection in March?

9      A. I don't recall.

10     Q. Okay.

11     MR. MILLER:  I have no further questions.

12     MR. ALLRED:  Okay.

13     THE WITNESS:  Thank you.

14     MR. ALLRED:  Thank you for your time.

15     (Whereupon, the deposition in the above-entitled

16     matter was concluded at approximately 1:50 p.m.)

17

```
1                       C E R T I F I C A T E

2        STATE OF GEORGIA      )

3        COUNTY OF GWINNETT    )

4     I hereby certify that the foregoing deposition

5        was taken down by me, as stated in the caption; and the

6        questions and answers were reduced to print by me; that the

7        foregoing pages 4 through 130 represent a true, correct,

8        and complete transcript of the evidence given on March 21,

9        2008, by the witness, DANIEL ARNOLD who was first duly

10       sworn by me; that I am not a relative, employee, attorney

11       or counsel of any of the parties; am not a relative or

12       employee of attorney or counsel for any of said parties;

13       nor am I financially interested in the outcome of the

14       action.

15     This the 24th day of March, 2007.

16
```

```
1                    E R R A T A   S H E E T

2      I have read the within and foregoing pages

3       numbered 4 through 130 and no changes are required:

4      This, the _____ day of _____, 2008.

5      _____

6      DANIEL ARNOLD

7      Sworn to and subscribed before me, this _____ day

8       of _____, 2008.

9       _____

10      Notary Public

11       - - -

12      I have read the within and foregoing pages 4

13       through 130 and the following changes are required as a

14       result of the transcription thereof:

15      Page _____ Line _____: _____

16      Page _____ Line _____: _____

17      Page _____ Line _____: _____

18      Page _____ Line _____: _____

19      Page _____ Line _____: _____

20      _____

21                                    DANIEL ARNOLD

22

23      Sworn to and subscribed before me, this _____ day

24       of _____, 2008.

25       _____

26      Notary Public

27
```